This was a criminal indictment, tried at the October Term, 1922, of Onslow Superior Court. The three defendants, George Williams, Frank Dove, and Fred Dove, were tried jointly for the murder of Cyrus Jones. Willie Hardison was tried first, and separately from the three defendants, for the same offense, and was convicted of murder in the first degree. The three defendants in this cause were also convicted of murder in the first degree.
The evidence of the State was to the effect that Cyrus Jones, a mail carrier from Swansboro, who also operated an automobile for hire, was *Page 680 
shot on the highway about a mile and one-half from the town of Swansboro, at or about seven o'clock on the afternoon of 5 August, 1922. After he was shot, he drove his automobile back to the home of a neighbor, John Midgett, where he stopped, his wife, at the time, being away from home. Midgett answered his cries for help and asked him what was the matter, to which he replied that he had been beaten to death, and there was no chance for him, and asked that he might be taken out of the car and into his home. Midgett then asked him who had beaten him, and his reply was, "Collins, Williams, and Doves." There was ample evidence to the effect that Willie Hardison was known in the community as Collins.
The news of the mysterious shooting of Jones was noised throughout the community, and his neighbors hastened to his bedside. He told those standing about to get the doctor — that there was no chance for him to live, and to different witnesses he stated that Collins, Williams, and Doves shot him in an effort to take his car. He languished from Saturday until the following Wednesday night, mostly in a subconscious state of mind, when he died of meningitis, caused by a gun-shot wound inflicted in the left side of his head with a size four or six shot.
Hardison testified that some time prior to 5 August, Jones, who operated an automobile for hire, had taken him and the three defendants to a place called Marines, some ten or twelve miles away, to a dance; that Jones had an understanding with his passengers that they were to leave at 12 o'clock, and, failing to get them together at that time, he left them at Marines. Hardison said that the three defendants in this case told him that they intended to "get" Jones for leaving them at Marines; and on Friday night, before Jones was shot the following day, Hardison, the three defendants, Williams, Frank and Fred Dove, and one Clyde Sanders met at a tobacco barn belonging to one Nash Bell, where (647) Hardison was curing tobacco, and that they then and there agreed upon and planned the killing of Jones; that Hardison was to tell Jones the following morning that the three defendants wanted him (Jones) to take them to a place called Stella on Saturday afternoon, and that they were to meet at or near a colored church a little more than one mile from the town of Swansboro. It was agreed that the gun with which they were to kill him was to be hid in the woods, and a bush was to be thrown in the road so as to indicate to the defendants where the gun was concealed. When this point was reached, they were to stop Jones on the pretext that they had some whiskey hid in the woods and wanted to get it.
Hardison said that he saw Jones on the morning of 5 August and made the arrangements, and it was agreed that he (Jones) would come *Page 681 
by for them about six or six-thirty in the afternoon. The evidence of the State is to the effect that Jones passed the colored church about six o'clock in the afternoon, having with him, as a passenger, one Captain Merritt, and that Hardison was standing in front of the church waiting for him. Hardison told Jones that they were ready. Later, the three defendants came by the church where Hardison was and told him that they would go on a road leading out from the main Swansboro road, referred to in the evidence as the Belt Road, and would there wait for Hardison to come with Captain Jones. Hardison said that Jones came by the church, took him in the automobile, and that they went out the road in the direction the three defendants in this action had gone; that the three defendants got in the car, and that when they reached a path that led to the place where Hardison stayed, he got out of the car, but he noticed, in a minute or so, that the car had stopped about one hundred and fifty yards further up the road; that he went to the car and asked Captain Jones where the defendants were, and that Jones told him they had gone into the bushes to get some whiskey, so they said. Hardison says he went a short way into the bushes and there he found the three defendants in a squatting position, and that Williams had the gun drawn on Jones, ready to shoot, and that they made him (Hardison) take the gun and fire the fatal shot, which, he says, he did. Hardison says they all went to Jones after he was shot, tried to stop his hollering, turned the car around and started him back on the road towards Swansboro, and that they all then fled.
There was evidence on the part of the State that the tracks around the automobile indicated that several persons had been in and around the car. There was further evidence to the effect that the three defendants were seen coming out of Swansboro in the direction of the colored church, and that the defendants Doves were seen within forty-five or fifty yards of the colored church about six o'clock, and that the defendant Williams was seen a little before this time coming out of (648) Swansboro.
There was some evidence to the effect that one of the Doves had stated during the week that he expected to be in New York the following week; and Williams had also stated to one of his companions at the sawmill that he did not any more mind killing a man than he would a snake.
It will be necessary to state some of the evidence a little more particularly so as to fairly and fully present one or two serious questions in the case, which we will now proceed to do.
Dr. J. P. Henderson, witness for the State, testified: "Am a practicing physician at Swansboro; practiced since June, 1915; knew Cyrus Jones; called to see him the evening of 5 August this year; arrived *Page 682 
about 8 o'clock. He was at the home of Mr. Midgett, a next door neighbor, in bed. His condition was what I would term shock; his pulse was very rapid. His extremities were beginning to get cold. Showed evidence of a gun-shot wound in the left temple region. His clothes very bloody. There was a penetration of the skull just in front of the left ear at this point (indicating) about the size of a dime; the bone was detached but not broken away from the point of penetration; gun shot had penetrated left side of head from upper portion of the neck to the top of the head. The shots entered at an angle of about 45 degrees — very little more than that. I can show you better than I can tell you — about like this (indicating): entered so that penetration was upward. Larger number of shots seemed to have entered this part than any other place. It was the left temple region. Just about a quarter of an inch in front of upper insertion of left ear and above the zigmoid — that is the process of the temple bone, which meets the process of the maxillary bone outside of the skull. Found one bruise on left costal cartilage near junction of the cartilage with ninth rib; there was a small bruise about an inch and a half in length, as best I can remember. Another bruise just below that smaller, about half the size of first. They were the only bruises, unless they were masked by these gunshot wounds. The wounds were on the left side; I believe he was conscious, partially conscious, I would say. Think he remained so about thirty minutes; did not regain consciousness afterwards that I know of. Died on the following Wednesday after shooting. Saw him after he was dead. Think he died of meningitis as result of gunshot wound."
Cross-examination: "From character of wound, the probable position of person who fired the shot with reference to the body was at a point opposite the left side of the man's head. Shot seem to have entered direct, going slightly up. Probed some of the shot wounds, but not the inter-cranial wound, one inside the skull. No powder stain on person that I noticed. Impossible to tell just how many shot struck him. A great many, though, not a few. At a place indicated shot seemed to (649) have gone in a wad; others just single shot wounds. Outer table of skull was broken. Dr. Jones made an incision in the scalp just at base of posterior extremity of left parietal bone, the bone that makes up the vault of the skull on the left side. Found outer table penetrated; did not ascertain whether shot entered brain at that point — probably they did. Large one of wounds or bruises on body, about an inch and a half long, nearly inch wide; small one near inch square, about two and half inches apart. Skin what we term grazed; bruised, but not broken enough to bleed — bruised in a scratchy way. Appeared to be same clothes on him when shot. Noticed no break of garment where bruises were. I said yesterday he was partially conscious — best I remember. *Page 683 
Don't remember using term semi-conscious. Semi-conscious means partially conscious, and may mean more or less conscious. There was some consciousness — enough to cause man to speak when asked certain questions. I stated that in half hour of consciousness he had gone to stay, so far as I know. Shot had penetrated the brain and death resulted from that. Lower shot had penetrated the brain. Had gone upward at some kind of angle through the skull cavity, very slightly upward. At two places shot went in bunches. Place in front of ear was larger bunch; hole cut about the size of a dime."
Mrs. Cyrus Jones, widow of deceased and witness for the State, testified: "Live at Swansboro; saw my husband after dark after he was shot, close to an hour after he was shot; he was unconscious; was notified at my father's about a mile from the village. When I got to him he was conscious, but I was overcome and unable to go to him for about 25 or 30 minutes, and when I then saw him he was unconscious. Couldn't say he regained consciousness before he died. Sunday afternoon appeared to be somewhat conscious. Witness details reason why she thinks consciousness may have returned to him. He died Wednesday after dark, around eight o'clock, after Saturday on which he was shot. Right around two o'clock on his return from Maysville he left about $85 with me, on day he was shot, and kept $10. He was in the habit of bringing money from Maysville and leaving it with me when he got checks cashed for people or he would give it to them at the postoffice when they lived in the village, or would leave it with Mr. Davis. He was mail carrier and ran automobile for hire. Frequently carried money for people to Maysville and back. Got checks cashed for people in the village right often. I suppose this was generally known in that section."
John Midgett, witness for the State, testified: "Live at Swansboro; knew Cyrus Jones; saw him afternoon of 5 August somewhere around seven o'clock. Was eating supper; heard a car pass going in, heard somebody hollering, and jumped up and ran to the door; looked down road; jumped out and ran down there and then saw it was Mr. Jones, and I ran up to him and said, `Cy, what is the matter?' (650) (Each defendant objected and excepted to the question and answer and each part of the answer separately.) He says, `I am beat all to pieces. Take me and carry me in the house and get a doctor. There ain't no chance for me.' I took him out and carried him to my house and asked him, `Cy, who beat you?' (Each defendant excepted to question and answer.) He said, `Collins, Williams, and Dove.' I said, `Cy, what did they beat you about?' He said they were taking his car. I asked him where he wanted to go, and he said `To your house,' and I carried him and set him on the bed and he called for water and I gave *Page 684 
it to him and he spit it out. Told me to get the doctor for him, take him out of the car and to the house and get him a doctor, and that there was no chance for him. I got Freeman to go for the doctor, who was there about twenty minutes after I took him out of the car. Before I asked him who beat him up, he stated there was no chance for him.
"Q. Who did he say beat him up, if anybody? (Objection and exception by each defendant to the question and the answer.) Witness answered, `Collins, Williams, and Dove.' He remained in my house until he died; was conscious when the doctor got there. Lived about twenty yards from me; died Wednesday, seven minutes after eight o'clock following 5 August."
Cross-examined, the witness testified: "His statement to me about who shot him was made about seven o'clock. I told it that night — don't know exactly what time nor to whom. Don't remember whether I told it to the first people who came. When I first asked him, he said Collins. Don't know how many Collinses in that neighborhood, nor how many Doves. Some people call him Willie `Collins,' and some call him Hardison. Knew his name only as Collins up to the shooting. Told crowd there what the sick man had said. Don't know that I told it as soon as I got there. Went with the crowd that night to try to ferret out things. Went to John Dove's twice. Went first and examined guns — found nothing wrong, none of Dove's guns had been shot. Went back the second time and took Frank and Fred Dove down before the mayor, and guess the mayor examined them separately, and examined whatever evidence they could get. The boys then went back home and were arrested later. I went with them to George Williams' house that night. They examined the guns and found no gun there that had been shot; found only one gun. We examined Dove's, Williams', and Jimmie Harper's houses that night and found no freshly shot guns. We examined the guns. Harper and his son Henry came to the door at his house. I think they examined colored people's houses all around there that night after the wounded man had told me what he told and after I had told it to others. There was in the neighborhood at that time John Dove and his brother and his (651) son Jimmie and Frank and Fred Dove, all of them and the old man were there. We went to John Dove's brother's house the night of the shooting. He lives about 350 yards from the place of the killing, I suppose. Suppose John lives something like half a mile — maybe nearer a mile. I guess Frank and Fred lived with John. Was only with the crowds that went to Dove's and Williams.' I declined to talk with counsel for the Doves about the matter after I had been subpoenaed by them. The reason was I didn't want to tell about it until I got on the stand where they could all hear. Was not under supoena [subpoena] by State *Page 685 
at that time, but was subpoenaed by the defendants. Time Jones made the statement that he was done for, was before taken out of the car. I told the solicitor what I knew about it before that time."
R. W. Freeman testified: "Live at Swansboro; saw Jones on evening of 5 August; was down town and coming back home, got right to the gate. My wife came and said somebody hollered in distress, ran down the road, and got in a few step of him, and John Midgett asked me to get the doctor, and said Cy was beat all to pieces." (Defendants, in apt time, objected on the ground it was hearsay; overruled; each of the defendants excepted.) Court said: "What the witness has testified to is not substantive evidence, but is to corroborate the witness John Midgett. If you find it does so, you being the judges." Witness further testified, "I got the doctor as quick as I could; Cy told the doctor that if they didn't do something for him he was gone."
"Q. What other statement did you hear him make?" (Objection by defendants; overruled, and defendants excepted to the question and answer.) "A. He said Collins and Dove murdered him or beat him. This was before the doctor arrived. He was in the house sitting up on the side of the bed. I heard his brother ask him who did it." "Q. What did he say?" (Objection by defendants to question and answer; overruled, and defendants excepted.) "He said Collins. That is all he said that time. His condition was very bad, bleeding. Looked like he had been beat to death and shot. The car was shot and bloody. The crossbars of the car that hold the top had been shot, and I think some shot had penetrated through the top. Nothing the matter with the car except the shot through the top and cross-piece, except it was bloody all over the seat; pretty near a quarter inch deep in blood. There must have been a gallon or more blood in the car. Also saw two puddles where he was shot. This was next day. Must have been a half gallon at each place. Was blood on the inside of the car and indentation of the brace — two puddles of blood on the outside. Brace looked like some solid wad had struck it; like two or three shot might have gone together. Brace kind of battered up. Was there in five or ten minutes after Jones was taken to Midgett's. First heard of it 50 or 75 yards away. I ran to it. Think Jones was conscious. Am not a doctor. Couldn't (652) swear he was conscious. Must have stayed an hour before I went home; was there off and on till one or two o'clock. Didn't see bruises on body."
I. E. Rogers testified: "I live at Swansboro; saw Jones night of 5 August; first saw him sitting on his bedside at John Midgett's with his head hanging over, moaning and groaning — bloody all over — looked like he had been terribly beaten. (Exception.) I sat by him and said, *Page 686 
`Cy, what is the matter with you? Who's been beating you up like this?' He says, `Collins and Doves.' (Each defendant in apt time objected and excepted.) He said, `I wish somebody would run my car in the garage. It is out there in the road and somebody might run into it.' It wasn't but a little while before the doctor came. He said, `Doctor, if you don't do something for me I shall die.'" (Objection to above by each defendant, and exception by each defendant.) The witness further testified: "I think Mrs. Freeman and Mrs. John Midgett and maybe Richard Freeman were there. He was in Mr. Midgett's house. Saw him next day, Sunday, pretty low and unconscious."
Willie Hardison, witness for the State, testified: "My name is Willie Hardison. Knew Captain Jones nearly two years. Captain Jones hasn't taken me to Marines. I have only been there once and came back with Hash Bell and his wife and two other men." The witness had been asked if Captain Jones ever took him, Frank Dove, Fred Dove, and George Williams to Marines prior to 5 August. Being asked what the defendants said to him with reference to Cyrus Jones leaving them at Marines, said, "They told me that they had it in for him and were going to get him; that George Williams, Frank Dove, Fred Dove, and Henry Harper told him that, two or three weeks before Jones was killed. They said he carried them down to Marines to a dance and left them, and they had to get some one to bring them back; told me at church on Sunday two or three weeks before he was killed. Told me nothing else but that they had it in for him and were going to get him. I saw them after that, maybe Sunday, when I went to church and Sunday School. Didn't see them subsequent to that when they had a conversation relative to killing Captain Jones." Being asked by counsel, "Did you meet with them at the tobacco barn? Now just go ahead and state to the jury all you know about Fred Dove, Frank Dove, and George Williams being in the plot to kill Captain Jones." Witness answered, "They didn't tell me anything about a plot to kill him; just asked me to ask him to take them to Stella to do some trading." Witness being further requested by counsel for State, "Well, just go ahead and tell everything they said to you at the barn." Said, "I was at the barn that evening when Nash Bell came from Greenville, and I came and told him I did not have any oil to cure tobacco with, and just before dark Fred Fenderson came (653) from Bear Creek and Nash Bell was fixing to go to town in his car, and he went with Fred and when he got back he called me and I went to the house, and he told me to come in and get supper, and I told him that I had had supper, and while I was there Frank Dove, Fred Dove, Cheevey Williams, and Red Harper and Henry Harper came there, four boys." The court: "What Williams did you say?" *Page 687 
Answer: "George Williams did not come there to the house. When I went back to the barn, George Williams was there at the barn. No one but him was there. He and I sat down and drank some wine, and he said he wanted me to ask Captain Cyrus what he would charge to take four head up to Stella to do some trading, and he asked me to loan him the gun, and I said I would, but didn't have any shells, and he said he had to hurry back home and go to a lodge meeting. I told him he need not hurry, and he said he had to go home and put his clothes on, and he went, and directly I heard a car leave and Frank Dove, Fred Dove, and Henry Harper came out there, and Frank Dove asked me to ask Captain Cyrus, and I said I would, and they sat around there talking and wanting me to go back to the house after some wine, so they sat around there a little while and then went on home. I stayed at the barn all night curing tobacco. Next morning I went to Simon Bruton's after some shoes and returned after mail came in and went to Swansboro and to the mill and came back, and Captain Cyrus came around the corner and drove up after some gas and went in postoffice, and a man came behind him and wanted gas and he had to move his car, and I jumped on the running board and told him that George Williams asked me to ask him how much he would charge to take four head up to Stella to do some trading, and he said he was going to Maysville for a man and it would be pretty late before he got back — somewhere between six and seven o'clock — and he went on and I went up home with him and got out, and that evening I carried the gun down to George Williams' house right open on my shoulder — about three-quarters of a mile. I went to the church house, was sexton of the church, and directly after I got to the church Frank Dove came by with horse and buggy and I jumped in and took my can to get some oil down town, and Frank said he would carry the horse back, so that evening, about an hour after they had gone, they all came back to the church, George Williams, Frank, Fred, and Henry Harper. They told me when he came to bring him on up there to Dr. Blount's road, a little road that leads up there by Sanders' — and they would be up there by that little field when I got up there. About that time Captain Jones came by and had one man with him, and the preacher came along after that and I shook hands with him and told him I was going up the road there by Dr. Blount's and I would overtake him; so I got into the car with Captain Cyrus and went on up there not quite a hundred yards. I was the only one in there with Captain Jones, and there were four head of (654) them when we got up there — all but Henry Harper, so I backed out, knowing there were four of them, so I said being as there were four of them and they were loaded I would go on up there to my road and get *Page 688 
out; so George Williams got in front and the two Doves behind. I got in with them, and when they got to my road they put me out and then they hadn't gone far when the car stopped and I hadn't left this road and I went up there and asked where the boys were, and Captain Jones said they had something to drink and had gone in the woods. They had left the car and gone in the woods, so I went around there in the woods and when I got down there they handed me the gun — George Williams did. The Doves were right there. The Dove boys said, `Go and shoot,' so I up and shot the man. It was right in the woods and when you step from the car track you are right in the woods, and he leaned over on the left side and Frank Dove grabbed him to keep him from hollering. George Williams was standing up there by him, and I got scared and ran and overtook the preacher. I went on by the path I was going before and on home. I carried the gun on until I got nearly home and hid the gun — threw it in the woods. Got it that night. Carried it home that night. When I started to run, after Captain Jones was shot, they told me not to tell it, that it would ruin their lodge. They said it several times. I was running. George Williams said it — not to tell it, that it would ruin the lodge. They told this six or seven times while I was running, before I got to my road. Don't know where I got the shell that I shot him with. Gun was loaded. Not loaded when I gave it to George Williams. I didn't have but one shell and shot that shell that evening over in the field at a crow. The shell had been in the house a good while. Nash Bell got it down at Marines a good while before — was old and couldn't see any figures on it. Boys said they wanted Captain Cy to carry them to Stella — some fifteen miles from the church, I reckon. Been down there two years lacking about two months. Came from Belgrade. Was driving a log wagon out there and Nash Bell took me in, as I had no father and mother. Didn't start from Swansboro with Captain Jones — got in with him there at the church, where I was cleaning up — colored church about a quarter of a mile from where the shooting took place. Boys waited for me somewhere around half the distance, not quite half. Boys were waiting at the field Dr. Blount lives in at one edge of it. Right on the front there is a little woods and the field between, and as you leave the main road it goes on out where a little road goes through back of Dr. Blount's house and comes out here by his gate — Mr. Harry Stanley's. There is no house between the church and the field there at Dr. Blount's. After you leave the church there is another little field on the road besides one I talked about. No (655) house on it. Somewhere around 75 yards to Dr. Blount's field. Uncle Lias Ambrose's house is first. When you are coming down towards the church you get to his house in the field before you get to Dr. Blount's field. When you are going out from the church towards *Page 689 
where the killing took place, you first come to a little field. There are fields on either side of the road, and you get to that field on one side of the road about three acres, and on the other side of the field about four acres. The three-acre field is on the back side of the church from main Swansboro road. The church site right on the hill as you come from town. About 25 yards back of that church is the four-acre field on the right as you go towards the place of the killing, and on the left there is a three-acre field, and then you go on, and these boys were right at the corner of this four-acre piece. Didn't pass any house from church to where they were. Uncle Lias' house not on that field. Boys were standing right at the corner of this road that goes through by Dr. Blount's house and comes into other road. There were three boys there and four were to go. Those three and Mr. Jones were all in the car when we left that place, George on the front seat and all of us started together. First house passed was Clyde Sanders — not far, don't know exactly how far. Next house passed, George Williams'. I went with them about 50 yards beyond George Williams' and got out of the car." Being asked why he got out of the car, he said, "I was going home. I didn't know there was anything like that up." Being asked, "well, as you didn't know there was anything like this up, why did you say that the Harper boy backed out?" He answered, "He backed out from going where he was going. I didn't stay long after I got out because the car went no ways — did not go anywhere. There is a crook up in the road, but they hadn't gone around that crook when they stopped. Went to the car because I thought they had a blowout or something. Don't know whether I had to go fifty yards or not. Didn't hear any blowout — went up as soon as the car stopped. Found Jones sitting in the car. Others not there, but about half length of the court room out in the woods. Asked where the boys were, and Captain Jones said they were out in the woods — had something to drink, and I went out there; found them fixing to shoot; kind of squatted with the gun cocked; pointing out in the bushes; didn't walk right up on them, kind of a path leading to where they were, I went bside [beside] them. Not far from them when they saw me — not right at them. Had gun about to his breast, George Williams did; squatted down; handed me the gun already cocked, told me to shoot Captain Cyrus, and I said, `I haven't got no harm against him,' and he said, `Shoot the man or we will kill you and him, too.' I was on the side of them — about the same distance from Captain Jones as they were. They were all right in a bunch. Didn't hold gun long before I shot. Said nothing after they told me to shoot. I was standing up (656) when I fired straight up. Sure didn't want to shoot him. I didn't back off and cover them with the gun and back up to Captain Jones instead of shooting him, because there were three of them and they *Page 690 
could overpower me. I don't know what they had. They had their hands in their pockets. As soon as I fired we all went out of the woods, Captain Cy fell over on his side — on his left side, the side he was shot from. I didn't stay there more than a minute — said nothing to him; put my hand on him to see where he was shot — put it on his head. I didn't mean to kill the man. Fired to miss him and the wrong shot killed him — he didn't say anything. Frank Dove put his hand over Jones' mouth and I ran off. I left them at the car. Had to go about three-quarters of a mile to get back home. Threw gun in the woods about 200 yards from Nash Bell's; threw off across ditch; got back to Bell's about dark. He and his wife sitting on porch. I got with preacher. Hid gun before I got up to the preacher where I got on the main road. Preacher was ahead when I hid it — about 50 yards ahead. Hid gun because I was scared that they would put it all on me because I had the gun. Reason I didn't tell right away, I had been forced to shoot Jones, because I didn't know what they would do with me. Had gun in my hands until I saw the preacher, up side of my body swinging it. Carried it on my shoulder when I went to George Williams', but was running and had it in my hands when I was returning. Had gun in hands when I left Jones' car — ran all the way till I saw the preacher; got to Nash Bell's after supper, about dusk dark. Preacher was taken on in kitchen. I didn't eat any supper; went out on porch awhile. Had been curing tobacco and had not slept, so went on out and to bed. Had dropped off to sleep when people came to Bell's. Didn't hear them when they came up. Bell's wife standing at the front door talking. I heard them say Captain Jones was killed and they didn't believe I did it, but knew something about it. I remained in bed. They asked Nash if I was there, and he said `No.' Nash thought I was gone; went back very quick. I didn't go to sleep afterwards. They didn't come back, but Mr. Clyde Pittman and others did. Don't know how long before they came back. After they left Nash Bell asked me if I knew anything about it; I told him no. I didn't borrow the gun from Nash; I lived there and had the gun at the barn — carried it up to Williams' Friday evening about three o'clock. Nash asked me where his gun was. I told him out at the barn leaning against the arch — barn about 20 yards from house. He went out and returned, said gun wasn't there; told me to get it pretty quick. I went and got it. About ten or fifteen minutes afterwards second crowd came. I was upstairs again and in bed when they came the second time. They told me to put on my clothes and come downstairs. High sheriff, Mr. Clyde Pittman, called me down; didn't put on (657) same clothes I had taken off that night because they were wet and lady didn't want me to leave them on the floor, so I took the clothes, pair of overalls, off; put on pair of dry pants; changed *Page 691 
shirt; it was wet, too. I was wet through with water; little blood on the overalls; I hadn't even seen it; say blood was on leg of overalls. I didn't know it was there. They showed me a little blood on the cuff of my sleeve. Mr. Henry Jarmon did this and went upstairs and got the shirt. Some of them did this, didn't get overalls. When they brought shirt down and out to car in road I was there. They asked me if it was my shirt; I said yes. They asked me where I got the blood. I told them I reckon I had squashed a mosquito. Blood was on the cuff. I explained the blood on the overalls by my having stepped up on the running board and getting it on them. I hadn't seen that, though. They took me off — carried me to white folks' schoolhouse. Don't know all the crowd, but there was Henry Jarmon and the high sheriff. They asked me to tell them, and I told them I didn't know anything, and some of them were hollering, `I wish we had a piece of rope,' and some said, `Here is an inner tube, wonder can't we hang him with that?' Some men shot down by my feet and somebody hit me, and they said they didn't want to hurt me that way, and took me to a log and said, `Now, boy, tell the truth about it,' and I said I didn't know what to tell, and they put me across the log and little Henry Jarmon said, `That isn't the way,' and he got me down and they hauled off and hit me about four times, and somebody hit me with a stick. I don't know who it was, and I told them the names, and they said, `Well, you ought to have told us that at first,' and they went and got the other ones. They carried me back and two cars stopped at a man's house and the car I was in went on down to the church again. Handcuffed me to the steering wheel and left a man there with me. I didn't tell them anything; just told them the other three, and they went back and got them. I did not tell them anything about who fired the gun then, but I did after I got to the New Bern jail. Talked to the high sheriff, this man here (points out Sheriff J. D. Williams of Craven County). He's first man I talked to besides the boy that was in jail that I talked to that night. Sheriff of Craven took me out in the room and asked me and I told him. Told him the same thing I told when I went out there and he asked me my age, and I told him fifteen years, and he asked if I had any living father and mother and I said `No,' and he said, `Just as a matter of business, go ahead and tell me about it.' So I told him these boys asked me to ask Captain Cyrus his charge to take four head up to Stella to trade, and I asked him, and he said have them ready between six and seven o'clock and he would come back, so they came back by the church and told me they were going up the road apiece. We went up there and I got out (658) at my road and the car stopped and I hadn't left the road, and I went up there and asked him where the boys were, and he said, round there in the woods, and I went over there in the woods and they handed *Page 692 
me the gun and told me to shoot the man, and I said I didn't have any harm against the man, and they said shoot him, and I up and shot him, and went out in the road where the car was and stayed there about a minute and jumped and ran. I talked to somebody in Onslow jail about it. I did not tell the truth about it — was scared to tell anything. Don't know who it was in Onslow jail. Little Henry Jarmon and some more of them talked to me. I talked to Mr. Pete Smith and Mr. G. W. Jones before I went to New Bern; told them George Williams did the shooting. On the way told them I carried the gun to George Williams' house before the shooting; didn't tell them I carried the gun into the woods and hid it. Didn't tell Mr. Jones and Mr. Pete Smith that I took the gun out in the woods and had it. Didn't tell Mr. Jones and Mr. Smith that in jail, but did tell them Williams did the shooting. Same man that was with Mr. Smith in jail went with me and the high sheriff to New Bern; don't remember his name. I told that man on the way to New Bern that I did shoot him, and told him I felt better after I told the truth about it. Was not with Mr. Cyrus Jones right often about Swansboro, only one time, the day of the killing, going out from Swansboro home, about two o'clock. Went home as he was going back to Maysville after a man on the late train; had understanding with Nash Bell I was going to buy his car, after cotton came off in the fall; was to make a cash payment of a hundred dollars when we sold cotton, if it brought anything. He gave me an acre and I had rented an acre from his father and planted cotton and sweet potatoes. I had helped make the wine Nash Bell had there. I know Frank Humphrey, not Jim. Loaned me 50 cents one time, which I paid back in a piece of meat. Don't know exactly when. Tried to borrow a dollar more from him and he wouldn't loan it to me, about a month before the killing. Didn't offer to sell him whiskey, because I had none to sell. Didn't try to sell Mr. Dick Freeman any whiskey, did not say that I had any whiskey out back of Pittman's field."
Cross-examined by Dove's counsel: "Since they put the stick on me, I have told the thing only two ways — one to save my life until the court, that George Williams did the shooting. Told in the presence of Sheriff Williams and counsel of Doves the same thing I have told today. Said it was done with the man's gun I stayed with; said it when I carried the gun to George Williams' house. Neither of Dove boys ever went off with me on trip to Marines. Never knew either of them to go on trip with Captain Jones; only what they told me. Never knew either one to do that. Told you that Frank Dove, Fred Dove, George Williams, and Henry Harper got me to see if Mr. Jones on Saturday (659) would take them to Stella to do some trading. Didn't swear yesterday in my trial it was to Maysville. Am certain I said *Page 693 
Stella, and say Stella now. George Williams had the gun when I went out, and handed it to me. There wasn't any gun going up there in the car, when they left me. When they put the paddle on me, I told that other folks were in it besides myself. They told me they knew I was in it, and it would be better for me and easier for me if I implicated other people. I told them I did not know anything about it. They put me across a log, face down; two men took hold of my feet. I would not respond. They beat me with a stick before I told them what I did — hit me four times with an inner tube, and once with a stick; then I told them what I told, and am telling now. I had been down there before the mayor that same night and at the same time Frank, Fred, and George Williams were before the mayor. Also Baynor Blackwell was before the mayor. They examined me privately and listened to the witnesses. They didn't turn me loose — turned the other boys aloose. I hadn't implicated them. Don't know why I didn't tell them then — other boys were in it — was scared to tell anything. Never told in the presence of Larry Stanley or others that I hid the gun out there where he was killed, nor that I dragged bushes nor put some pinetops on the road so I would know where to stop and know where the gun was, nor that I hid gun out by the fence and told George Williams where to get it. I just told what the boys told me about Captain Cyrus carrying them off and not bringing them back. Just wanted people to believe what was right. The lodge was the Knights of Gideon. Dove boys not members — old enough but hadn't joined. Williams was a member. Knew that Captain Cyrus carried money for other people because he cashed check for me and Nash Bell's wife once, didn't know how much he carried. He was a mail carrier. Was not in store that afternoon when he paid for gasoline. Got his gas outside and went in the store with a crowd of people to pay for it. Didn't see his money at the postoffice that day. My oldest brother killed my father, I couldn't even walk or talk. I was convicted here yesterday of murder in the first degree; went on stand in my own behalf — swore I was forced to shoot Captain Cyrus. The boys were over in the woods some little distance from the road. I went where they were. They made me shoot him. I told them he had done me no harm, and I didn't want to shoot him. Captain Cyrus could hear good, but wasn't near enough to hear. Could hear all right, and had good eyesight. Front of car was turned towards Maysville away from church; left these three boys at the car, which was right in the road. When I shot, Captain fell over the door of the car towards me — blood came out. I went and left the other boys there; Frank Dove holding his mouth; my hand must have been mighty close to the blood. Did not hide my clothes. Threw overalls out on (660) the porch, not in the box. Put shirt in the back porch, not *Page 694 
with overalls. Threw gun in bushes, and while in the act of getting back in road, I called preacher and he looked back and said something to me. Gun was broken apart. This done just as I was coming out on the main road, just before I got to the preacher. Just running along with it from killing to there, was in my hands while I ran past Graham's. Saw nobody at Graham's and saw nobody at Sander's while going to where I shot Jones, nor anybody at George Williams' while going; between six and seven o'clock when I went by Williams'. Wasn't any time from time I left church till I got back where I met the preacher. Did it in a hurry — was scared and ran. When I left two were standing up and Frank Dove was holding his mouth. They came out of the woods; halfway from here to the door, stood up there by him. I beat the crowd and left them standing there. Bought shell evening he was killed from Mr. Bartley at Swansboro. Nobody acting as my lawyer till Mr. Bender was appointed. Man unknown to me talked to me a little about the matter in the room yesterday. When counsel for Frank and Fred Dove came to see me in Craven jail, they told me that they didn't represent me and for me not to tell anything that would incriminate me. Was not in the Holland road talking to two girls when Eugene Graham came along on Saturday afternoon of murder. Didn't try to get two girls to go to church and help me to clean up in a hurry. When I was going out there that afternoon didn't think any harm was going to be done to him. Though they were all going off a nice trip. Didn't tell people I told Captain Cyrus I was going to get wine out there in the woods. I did tell Captain Cyrus that morning that the two Doves and Williams wanted him to take the trip. They wanted to go to Stella because they didn't have the quality of clothes at Swansboro they had at Stella. Stella was not on railroad, nor ocean, but on a creek. More suits of clothes there than at Swansboro. Big stores there, I don't know owner. Do not deal in Stella. Told Mr. Fred Pittman the night they questioned me that man I got in the car with at church was a stranger and I didn't know him — told a lie because scared and didn't know what they would do with me. Just told that George Williams did the shooting to save my life till court. Am now telling the same story I told on the stand yesterday. Stated on cross-examination yesterday that I said George Williams did the shooting. Haven't talked with the solicitor about it, not to counsel for State, till I got on the stand. I think the man in the room with me yesterday was Mr. Woodus Kellum. The man I stayed with sent to the Secretary of State and procured a Ford automobile license in my name, because I was to buy the car when cotton came off. *Page 695 
He got it in my name so when I bought the car the license would be on it. Don't know how long it was before the killing. (661) Signed Nash Bell's name to paper without his authority and got some money. He afterwards paid it to keep me out of trouble. Captain Cyrus had the new Ford a little while before he was killed; don't know how long. Had seen his new Ford one day out at church before day he was killed. I told Captain Merritt the night they had me down there before mayor that I had on the same clothes that I wore during the day, and he told me I was a liar, that I had on blue overalls and shirt and a straw hat when he saw me at work. I carried the shell home I bought from Mr. Bartley. Didn't give it to George Williams when I gave him the gun. It was at Nash Bell's when I left there. I left the shell there. Nash had it; got it after murder was committed. I had it in the pocket of my overalls; was a new shell; the one you have is the same one."
Captain Merritt testified: "I live at Swansboro; knew Cyrus Jones; was with him afternoon of 5 August from Belgrade to Swansboro, bringing me home in his new car. I was sick, and as we went he slowed down just before we reached the colored church, and I thought it mighty strange, and after slowing down he went a little further and slowed again, and directly he stopped and saw that boy." (Pointing to Willie Hardison.) Q. "You can tell what he said to that boy." (Objection by the defendants, and admitted by his Honor only for the purpose of corroborating the witness Willie Hardison). A. "Willie Hardison said, `We are ready, we are waiting for you right now.'" (Defendants objected and excepted to each part of the answer severally.) Witness testified further: "Hardison was standing on the colored church grounds. Captain Cyrus drove on and put me out and turned around and went on back; took a straight course in the direction Willie Hardison was. I went to the place where Mr. Jones was shot the next day. It was on the road that turned up there by the church; I never went up the road at all — just rode on by the church. It is off the main road on what is known as the Belt Road, I guess. I didn't wait up there often. I didn't see either one of the defendants, Williams and Doves, up there when Captain Jones brought me. Have known the defendants Doves ever since I have been around there, some 40 years, I think. Am not referring to the boys, had no dealings with them, was referring to their father, John. His character is good so far as I know. They have chartered my boat and I have had frequent dealings with the older ones; not acquainted with the reputation of Willie Hardison."
There was other and volumnious [voluminous] testimony tending to show the guilt of the defendants, and each of them, and that they conspired and acted together at the time of the homicide to murder Cyrus Jones, and that *Page 696 
Hardison had the gun, and shot Jones, the other defendants (662) being present, aiding and abetting and encouraging him to do so, the shooting being from ambush.
The evidence for the defendants tended to show that they were not at Marines with Cyrus Jones, and had no feeling against him or resent toward him, and no reason to murder him, and that they did not kill him or assist in doing so, not even being present when it was done.
Upon this evidence and the dying declarations of the deceased, the jury convicted all of the defendants of murder in the first degree. Defendants appealed from the verdict and judgment.
After stating the facts: This case was carefully tried, and the rulings during the course of the trial were well considered and made with strict regard to law and procedure.
The charge of the court was very full, learned, and explicit, and was perfectly fair and just to all the defendants, being, if anything, rather more favorable to them than they had any reason to expect. The jurors, if they heeded it, which they seem to have done, could not possibly have mistaken its meaning and significance. The contentions of the respective sides were very fully arrayed, nothing material or of importance being omitted therefrom. The law of the case was explained to the jury with great care and correctness, and the statute fully complied with in this respect.
Upon the evidence, including the dying declarations of the deceased, the jury convicted all of the defendants of first degree murder, that is, Williams and the two Doves, Hardison having been before convicted of the same crime.
Upon exceptions reserved by the defendants they appealed to this Court, and now ask us to review the entire record, so far as indicated by the specific exceptions, which we will now proceed to do.
It will be timely and appropriate at this stage of the opinion to repeat with some degree of fullness what the learned judge stated to the jury, in his charge, with reference to the dying declaration of Cyrus Jones, as the competency of what is called "his dying declaration" should be finally settled before proceeding further to discuss the case in the light of the evidence. It is as follows: "There has been admitted in evidence, gentlemen of the jury, testimony tending to show statements made by Captain Jones, which the State contends were made in the fear of his *Page 697 
impending death. The law of North Carolina is that such statements are admissible upon the ground of public policy, one (663) reason being that the victim and the perpetrators of the crime are often the only persons present, and our Court holds that such testimony does not violate the bill of rights, which gives every man the right to confront his accuser, and I instruct you that the rule is that the declarant must have been dead at the time declarations were given in evidence, and that the declarant, at the time he made the declaration, must have been in danger of impending death, and that he must have been in full apprehension of such danger. It is alleged and admitted that Captain Jones was mortally wounded on 5 August and died on 9 August. The State contends that a short time after he was wounded he was in actual danger of death, and that he was in full apprehension of such danger, and that he declared there was no chance for him, and that those responsible for his condition were Collins, Williams, and the Doves. And I instruct you, gentlemen, that you are the judges of the weight you will give to such statement and the credibility you will give the witnesses who testified to it. I further instruct you that it is your duty to receive the statement with care — carefully, but not superstitiously, remembering there was no cross-examination at the time it was made by the deceased." The allusion to the dying declaration could not have been better expressed or stated, and is but one illustration among the several of the intelligent manner in which the cause was considered and tried. The criticisms of the defendants' learned counsel are entirely inadequate to any successful challenge of the correctness of the learned judge's charge as to the dying declaration. They are founded upon pure conjecture as to the probable state of Jones' mind at the time its was made, and as to his semi-consciousness, and his being plied with leading questions, if he made any response to them at all, thus being led easily to his conclusions of fact relating to the circumstances of the assault upon him by the prisoners.
Reviewing the various exceptions taken to the judge's rulings and to his charge, we find none of them that is at all tenable. It would be idle and useless to discuss them seriatim, as each and every one of them is manifestly without any solid or genuine merit, and yet we do not feel that in so important a case, involving the lives of three men, and possibly four, we should fail to make some more specific reference to them than we have already done. We will therefore consider the prisoners' exceptions with some more particularity, though not taking them up one by one.
Counsel for the defendants move the Court for a new trial on the ground of newly discovered evidence, because of the fact that one of the witnesses has changed his story of the crime since the trial. If there *Page 698 
is any particular virtue in the changed statement of the witness, it should be addressed to the executive and not to the judicial branch of (664) the Government. However, counsel for the defendants take advantage of the opportunity afforded in a motion for a new trial to present to the Supreme Court, in the form of an affidavit, his version of the whole matter, including the conduct of the court, the conduct of counsel appearing with the solicitor, and the conduct of those in attendance upon the trial. The Assistant Attorney-General directs our attention to the fact, which he affirms and relies on, that some of the statements set out in the affidavits filed with the motion for a new trial, because of after discovered evidence, are new and heard for the first time when this motion for a new trial was entered. It is a well settled proposition of law that this Court will not grant a new trial in criminal cases for newly discovered evidence, to say nothing of reversed evidence. The latest decision reaffirming this doctrine is in S. v. Jenkins, 182 N.C. 818. This Court said in that case, by Adams, J.: "When the case was called for argument the defendant's counsel filed a motion for a new trial upon the ground of newly discovered evidence. The motion must be denied. In numerous decisions this Court has held that a new trial will not be awarded in a criminal action for newly-discovered evidence; and inS. v. Lilliston, 141 N.C. 857, the Chief Justice said: `So that point is settled, if the uniform practice of this Court and its repeated and uniform decisions to the same effect can settle anything.' S. v. Register,133 N.C. 747; S. v. Turner, 143 N.C. 641; S. v. Ice Co., 166 N.C. 403." And upon the question of nonsuit, or as to whether there was any evidence to convict, the Court further said: "An issue of fact was thus joined between the State and the defendant, and the court properly submitted to the jury the question of the defendant's guilt. In S. v.Carlson, 171 N.C. 823, it is said: `The motion to nonsuit requires that we should ascertain merely whether there is evidence to sustain the allegations in the indictment. The same rule applies as in civil cases, and the evidence must receive the most favorable construction in favor of the State for the purpose of determining its legal sufficiency to convict, leaving its weight to be passed upon by the jury.'"
Exception one, defendants abandon. Exceptions two, three, four, six, seven, and eight relate to the challenge of jurors for cause by the defendants, for that each of said jurors challenged had served upon the jury within the past two years. This special venire was drawn from the jury box with all the formalities of drawing a regular jury, and were summoned by the sheriff. C.S. 2326, provides that where the name of a juror is drawn from the box, it shall not be ground for challenge that he has served on the jury within two years prior to the court at which the case is tried, and all the decisions of this Court are to the effect that *Page 699 
it is no cause for challenge that a special venireman had served upon the jury within two years. S. v. Carland, 90 N.C. 668; S. v.Whitfield, 92 N.C. 831; S. v. Kilgore, 93 N.C. 533; S. v. Starnes, (665)94 N.C. 973.
In the fourth exception, when the juror Frazelle was challenged for cause on the ground that he had served on the jury within the past two years, and this cause for challenge was disallowed, counsel for the defendants undertook to peremptorily challenge this juror without being required to make it known in open court, so that the other jurors would not be affected or prejudiced by the challenge, if made openly and in their hearing. The court promptly, and properly, we think, stated to the counsel that if he would challenge the juror peremptorily, it must be done in open court, and it would be allowed, but that if counsel did not see fit to make the challenge openly, it would not be allowed. The disagreement between counsel for the defendants and the presiding judge as to what happens is, of course, settled by the finding of the court as to what it was which we have stated.
Exceptions nine, ten, eleven, twelve, fourteen, fifteen, sixteen, seventeen, and eighteen are grouped in defendants' brief as relating to dying declarations. The only objection raised by the defendants in their argument is that the statement of the deceased should not have been received, for that they are very close on the line of demarcation, and that the deceased was speaking, perhaps, unconsciously, and, undoubtedly, responding to leading questions, if he made any responses at all, but the evidence seems to be to the contrary. The deceased had driven his car a mile and a half back to Swansboro, and, before he was taken from his car, he told the witness Midgett that he was beaten all to pieces; that there was no chance for him to live, and that Collins, Williams, and Doves were the responsible parties. There was no evidence that he lapsed into unconsciousness until later on in the night, after which he made no statements whatever. The statements of the deceased as to who shot him come directly under the rules laid down by this Court for the admission of dying declarations. S. v. Peace, 46 N.C. 251; S. v. Whitt, 113 N.C. 718; S. v.Quick, 150 N.C. 820.
The thirteenth exception is complained of on the ground that it is hearsay, but there the witness Midgett was only stating to the witness Freeman what the deceased had said to him, and, if hearsay, it is absolutely immaterial and harmless, because it is merely a repetition of what the witness Midgett had just testified to.
Exceptions 19, 20, 21, 22, 23, 24, 25, and 26, taken to the charge of the court, are grouped in the brief of the defendants and based on the ground that they form expressions of opinion. The judge, more than once in his charge to the jury, tells them that he has no opinion on the *Page 700 
facts, and the exceptions above enumerated are taken to the contentions of the State, as given by the court in charging the jury. If the contentions as given by the court were incorrect, and they do not (666) appear so to have been, the counsel for the defendants should have objected at the time, in order to have given the court an opportunity to correct any misstatement of the contentions of the State, if, perchance, he had made any misstatement of the same. All the decisions of this Court are to the effect that when the trial judge is stating the contentions of a party to the jury, the opposite party must object at the time, if they would avail themselves of the objection in this Court, and if the party fails to object at the time, the objection is waived. S. v.Kincaid, 183 N.C. 709; S. v. Montgomery, 183 N.C. 747; S. v. Winder,183 N.C. 777; S. v. Sheffield, 183 N.C. 783; S. v. Baldwin, 184 N.C. 789.
The defendants could not have been harmed by the statement of the court that it was alleged, and not denied, that Cyrus Jones was dead, because the evidence of witness after witness was to the effect that he died on Wednesday night, 9 August, and never was any suggestion made by the defendants that he was not dead. Hence, the judge was merely stating a contention of the State, which was uncontradicted by the defendants; and if error at all, it was certainly harmless, and this Court does not concern itself with harmless errors. Hulse v. Brantley, 110 N.C. 134; Alexander v.Trust Co., 155 N.C. 124.
Exceptions 27, 28 and 29 seem to be abandoned by the defendants in their brief, and well might they be abandoned because in the court's charge, to which these exceptions are noted, his Honor tracked the law, as repeatedly laid down by this Court, to the very letter.
S. v. Whitson, 111 N.C. 695, answers the 28th exception, and S. v.Baldwin, 152 N.C. 828, the 29th and 30th exceptions. In the last named case, Justice Hoke, writing the opinion of the Court says: "Malice may arise from personal ill-will or grudge, but it may also be said to exist (in a legal sense) wherever there has been a wrongful or intentional killing of another, without lawful excuse or mitigating circumstances." This is implied or legal malice.
Exception 31: As to this exception, the court was undertaking to define how malice may be shown, and again the court followed the rules of this Court in defining malice. S. v. McDowell, 145 N.C. 563; S. v. Cameron,166 N.C. 379.
Exception 32: This exception seems to be abandoned by the defendants in their brief, and properly so.
Exception 33: In this exception defendants complain for that the court did not go far enough and sufficiently qualify the charge given. This is exactly what the court did do, for, after telling the jury that they should receive the testimony of the defendants and their relatives with *Page 701 
caution and scrutiny, the judge uses this language: "If, after such scrutiny, you are satisfied they are telling the truth, it will then be your duty to give it as much credit as you gave the (667) testimony of a disinterested witness."
Exception 34: This exception is properly abandoned.
Exception 35: Here again the defendants complain, for the first time, about the judge stating the contentions of the State. If, in stating these contentions, he erred, which it seems he did not do, the objection should have been made at the time, but none was made. S. v. Kincaid, supra.
Exceptions 36 and 37 are abandoned by the defendants, and rightly so.
Exception 38: Here the defendants complain that his Honor erred in failing to tell the jury that the defendants must have been present at the time of the killing, in order to make them guilty of murder in the first degree. If any error here, we think that it was cured by the language of the court used immediately before the language excepted to. Immediately before this exception the court said, "If you find from the evidence, and beyond a reasonable doubt, that the shot which killed Cyrus Jones was fired by Willie Hardison, in furtherance of a plan and design on his part, with malice and with premeditation and deliberation, and that the defendants, or either of them, were (when the fatal shot was fired), then and there present, aiding, encouraging and abetting him, it will be your duty to convict them, or such of them as you find so present, guilty of murder in the first degree."
Exceptions 39 to 46, inclusive, are abandoned by the defendants.
Exceptions 47: This exception relates to the refusal of his Honor to tell the jury that it was dangerous to convict exclusively on the unsupported testimony of an accomplice. The refusal of the court was on the ground that it was covered in the general charge, and this relates to exceptions 47 and 48. In his Honor's general charge to the jury, he said: "The jury may convict upon the unsupported testimony of an accomplice, though it is dangerous and unsafe to do so, but if the testimony of the accomplice, taken with other facts and circumstances in the case, carries conviction to the minds of the jury, then it is their duty to convict, remembering that the jury must be satisfied beyond a reasonable doubt of the guilt of the defendants before they can convict." What more could he have said, or how better could he have said it?
Exception 49: Here the court gave the instructions asked for by the defendants, and they now complain that he added thereto a correct statement of the law, contending in effect that the trial judge was unfair in correctly stating the law, because everybody knew the defendants were innocent. Counsel for the defendants in this exception, while complaining of the court, seem to lose sight of the fact that the State has some *Page 702 
rights as well as the defendants, which should be safeguarded.
Exception 50 and 51: In exception 50 the defendants asked (668) for certain instructions to the jury, and his Honor gave these instructions as set out in exception 51, stripped of surplus verbiage, the language of the court includes everything asked for by the defendants except that it was stated more succinctly and pointedly.
Exception 52: This prayer for instruction was covered in the general charge. His Honor charged the jury at some length on the caution and scrutiny that they should apply to the testimony of interested witnesses.
Exception 53: This prayer for instruction was declined on the ground that it was given in the general charge, but the defendants say they fail to find it in the general charge. But it is there, as will appear in the charge, as set out on page 86 of the record, next to the last paragraph on that page, and is included within the 28th exception of the defendants, which they abandoned in their brief, and is in language as follows: "I further charge you that it is your duty to receive the statements (dying declarations) with care — carefully, but not superstitiously, remembering there was no cross-examination at the time they were made by the deceased."
It appears that the judge not only fully covered the requests of the defendants in his general charge to the jury, but that he correctly stated the law, and conformed, at least substantially, to the language of this Court as used in S. v. Whitson, 111 N.C. 695.
Exception 54: This exception is purely formal, and taken to his Honor's refusal to set aside the verdict, and needs no more special reference.
The defendants seem to complain here, and for the first time, that they did not get a fair trial. They seem to believe that the whole case would have been changed and the verdict would have been different if a man by the name of Ramp Jones had not escorted the prisoner, Willie Hardison, from the jail to the court room. The counsel contends that Hardison was under the influence of Jones. While the suggestion is absolutely new, and is heard here for the first time, we call attention to the fact that if they had any ground for it defendants should have complained to the trial judge, and requested proper instructions, whereas no complaint was made, and, so far as the record discloses, the defendants discovered for the first time, after the verdict, that they had not had a fair trial, for the reason indicated.
In the affidavit introduced for the defendants Frank and Fred Dove, and filed in this Court, on the motion for a new trial, they set out the fact that an attorney visited Willie Hardison while he was confined in the jail of Craven County, and interviewed him with reference to what took place at the killing; that Hardison told him, on that occasion, that *Page 703 
his clients, Fred and Frank Dove, and the defendant George Williams were all present and assisted in the killing of the deceased. The witness Hardison could not have been under the influence of (669) Ramp Jones at that time. The witness Hardison only repeated upon the witness stand statements he had previously made when under the influence of nobody, and his testimony in the trial of these defendants was given after he himself had been tried and convicted of murder in the first degree. The Assistant Attorney-General, Mr. Nash (whoalways presents the State's cases, in an exceedingly able, accurate, and most satisfactory manner), contends that it is simply preposterous to advance the theory, at this late day, that the testimony of the witnesses would have been different, if the witness Hardison had been conducted to and from the jail by another deputy sheriff, and that the verdict would also have been reversed. And it does not (at least sufficiently) appear that there would have been any such change in the testimony or the verdict.
The evidence as to the dying declarations of Cyrus Jones having been admitted, it is only necessary to state that it was clearly competent evidence, because at the time the most essential part of it, and also a separate and independent part, was let in, the declarant had stated that he would certainly die, or used equivalent language, if not stronger language, when he said "there was no chance for him" to live, that he had been beaten to death. The judge, therefore, properly ruled in the declaration, although the declarant may afterwards have changed his mind and believed that the doctors might save him. It is evident, though, that Cyrus Jones, at the time when he declared as to the facts and circumstances of the homicide, had abandoned all hope, and that he spoke under the solemnity and in the very presence of impending death, which supplies the usual tests, as to the truth of what he stated, that is, an oath and opportunity of cross-examination by the party against whom his declarations are used.
There was some suggestion in the argument that defendants could not be convicted of murder, as principals, in the first degree, nor as principals in the second degree, as aiders and abettors. This contention was based upon the supposition, clearly not allowable, that the evidence showed that Willie Hardison was the principal, and that the defendants were only accessories before the fact, having before hand merely advised or counsel the commission of the homicide by him, and not having participated in the actual commission of it, as being present, aiding and abetting, Willie Hardison, the principal. But this position is manifestly without sufficient support in the evidence, when carefully considered, and the learned presiding judge correctly instructed the jury in regard to it. If the State's evidence is credible, and this was for the *Page 704 
jury, Hardison and the defendants were all guilty as principals, as they, with premeditation and deliberation, killed and murdered the deceased in a most cruel and heartless manner, and upon not only a (670) slight, but a frivolous pretext.
It was suggested, but only so, that perhaps Hardison, inspired by a yearning desire to save his own life, testified falsely as to the others, but this is met by what was said by Cyrus Jones, in his dying declarations, and is fully and completely contradicted by it. If he (Jones) told the truth — and he had every reason to tell the truth by reason of his serious situation at the time, and the truth of his words are confirmed by the solemn realization of impending death — there can be no doubt as to the guilt of the prisoner. But any consideration such as suggested by the prisoners is for the jury in impeachment of the State's evidence, or is a matter which should be addressed to the pardoning power and not to us, as we must be governed by the facts as the jury have found them.
There are practically sixty exceptions in this case, many of them of grave importance, requiring full consideration and discussion, and we have, in one way or another, adverted, at least, to those which could not be ignored, and were decisive of the case. It extended the opinion of the court far beyond ordinary limits, but this could not possibly be avoided if the case was given proper and adequate treatment, and is to be fully justified when not only the unusual importance of the case, and the gravity of the questions raised, are taken into account, and also the seriousness of the result, when four lives must be surrendered in the vindication of the law.
We do not recall any other contention of the prisoners that would either excuse, mitigate, or extenuate their crime, and upon a most careful perusal of the whole record, we are satisfied that none such exists.
The prisoners have been tried before an able and learned judge, by a jury fairly and impartially selected according to law, and there is no ground, or even plausible pretext, upon which we can base a reversal or modification of the judgment.
No error.
Cited: S. v. Barnhill, 186 N.C. 451; S. v. Green, 187 N.C. 468; S. v.Levy, 187 N.C. 587; S. v. Ashburn, 187 N.C. 730; S. v. Hartsfield,188 N.C. 358; S. v. Sinodis, 189 N.C. 571; S. v. Griffin,190 N.C. 135; S. v. Jackson, 199 N.C. 326; S. v. Casey,201 N.C. 625; S. v. Bright, 215 N.C. 539; S. v. Holland,216 N.C. 615; S. v. McKinnon, 223 N.C. 164; S. v. Smith,237 N.C. 24; S. v. Hooper, 243 N.C. 431. *Page 705