The defendant was convicted of murder in the first degree of one F. F. Newton, on 28 June, 1930 (Saturday), and sentenced to be electrocuted. *Page 544 
The facts: Mr. Newton had been postmaster at Kerr for 24 years, he was 70 years old, and in good health, weighed about 200 pounds. Newton always walked home at noon for dinner, between 12 and 1 o'clock, and followed the path that led through Seller's field, and usually brought a white sack with the home mail and business letters in it. When he left home that Saturday morning to go to work at the postoffice, he was wearing a light shirt, light trousers and a straw hat. He wore a watch attached to his trousers by a red string. Newton was found a little before sundown some distance from the road that leads to his home. A trail indicated that something had been dragged off, the grass mashed down flat, following the trail in the woods about 15 to 20 steps was found a slip of paper in Newton's handwriting. After a few steps the grass gave out and the trail was through bushes and shrubbery, it went to the edge of the bay and it looked like scuffling had taken place. Further into the bay where the bushes had been dragged down and separated, and about 20 steps further down behind a clump of bushes, Mr. Newton was found. When found he was called to; he opened his mouth and threw up his right hand and drew up his left knee; when called again he didn't move. He was bare from his waist line to his neck. His eyes were blue and swollen, and his head had been badly beaten, and on his head and back of his neck there were many lacerations, and his head was lying in a pool of blood. He had lost considerable blood. His breast and shirt and trousers were bloody. The top of his head had been severely beaten, about eight or ten times, one at the base of his neck was about three inches long. He died the next day. About a hundred yards from the scene of the killing the mail sack was found. A small piece of paper was found which led to the belief that the sack was near and about 20 feet into the bay the sack was found hanging to the trees, the family mail and newspapers in it. While bringing the sack out, two packs of cigarettes were found. The sack was found in about 35 yards from the road traveled by Newton and in the direction of Newton's home, and the defendant's home. Tracks were found "and they were made with leather bottom or stiff bottom shoes and they had been turned side wise and made a side wise track, and there were tracks that looked like they were made with rubber bottom shoes. The tracks were near the stump about fifty-five yards from where the body was found. On the trail that led into the bay, about twenty-five yards from the road, was a scuffled place in the bushes. There were two or more different sets of tracks. The main track was the rubber bottom track. About thirty yards from this stump on the left-hand side of the road going towards Mr. Newton's home, there was a place that looked like somebody had laid down on the grass and pressed their *Page 545 
elbows and knees down. One could see from this stump about one hundred yards up the road towards Kerr. Next morning about day parties started an investigation. Along the trail where Newton was dragged, on each side of this trail about two feet wide, there was a trail where someone had walked. Also there was a good sized scuffled place and some pens and nickels and other articles that were in Newton's pockets, and four or five steps along the trail was found a long club and two short clubs. The short clubs had been freshly broken. These were found about fifteen steps away from where Newton was found.
W. L. McPhail testified, in part: "Across the road from the stump we found where someone had laid behind the stump facing Kerr. Could see one hundred and ten yards towards Kerr. We observed rubber bottom tracks that made a round impression on the sand. We took the trail and went down side of the bay, crossed Deer Ford, and about three hundred yards down a path. There was a leather bottom track about the stump. We followed the track about a half mile in the direction of the defendant's home. Defendant lived about a mile and a quarter from the scene of the crime. I know the defendant. After we found the tracks and clubs we went to Kerr to show the sheriff the clubs and hat, and when we got there the sheriff had Ernest. They went and got Chevis and came back and the sheriff and some of the deputies went off with Chevis and asked me to keep Ernest until they returned. It was between eight and nine o'clock the morning of 29 June. Ernest had on brown tennis shoes, rubber bottoms. The right shoe was bursted out on the side. The tracks in the swamp were bursted out on the right shoe. We followed that track across the Deer Ford for about one-half mile. I asked him (Ernest) what he was arrested for and he told me it was for stealing gasoline. I asked him if he had on those shoes the day before and he said he did."
Ebb Newkirk testified, in part: "I saw the defendant, Ernest Herring, and his brother, Chevis Herring, sitting on Mr. Carter's store porch about six o'clock the day before Mr. Newton was murdered, 27 June, 1930. Mr. Newton went into the postoffice carrying some money that he was preparing to send off that evening, and Ernest and Chevis went into the postoffice. Mr. Newton was handling money, and Ernest and Chevis both saw him with it. They left the postoffice and went back to Mr. Carter's store porch and seemed to be engaged in a conversation. They stayed in the postoffice just a few minutes, did not ask for any mail and did not have any letters to mail. I heard nothing that was said between them after they left the postoffice."
The defendant went on the witness stand and denied his guilt. When taken to the scene of the crime at night by the officers, under most trying circumstances, he denied his guilt. *Page 546 
Dr. V. R. Small, testified, in part: "It is my opinion that the witness, Chevis Herring, is not crazy, but that he shows a decided mental deficiency. His mental development has been arrested at about the age of eight years. The fact that he is grown physically and apparently is a normal man physically has no bearing upon his mentality. He has the mentality of a child of eight years of age. (In answer to a hypothetical question) I have an opinion, satisfactory to myself as an expert on mental and nervous disorders, that in consideration of the fact that the witness, Chevis Herring, has the mentality of a child of eight years of age, that neither of his statements would have any more weight and should be no more worthy of belief than another. . . . If the jury should find from the evidence that the witness, Chevis Herring, and the defendant on trial had had a fight and that the witness, Chevis Herring, has slapped the defendant in the mouth and that the defendant had jerked Chevis out of the car, and that Chevis had taken a pump and struck the defendant with it, having the defendant down on his back on the ground, and that the defendant had cut the witness, Chevis Herring, with a knife and it required ten stitches to sew it up; and if the jury should find that the officers had this witness, Chevis Herring, in their custody and had put him through the third degree, and said: `Now, we want you to confess and not take all the blame on yourself,' I have an opinion, satisfactory to myself, that under those circumstances a child with the mentality of eight years of age would have a tendency to strike back and implicate another through a spirit of revenge, or in a spirit of shirking responsibility and shifting the blame to someone else. (On cross-examination): If the jury should find that the deceased had a watch on him and that witnesses have testified that he had a watch and identified the watch here as being the watch he had on at the time, and if the jury should further find from the evidence that Mr. Newton carried that watch attached to his pants pocket with a red string, and if the jury should further find from the evidence that Chevis Herring said that he got that watch of Mr. Newton's and carried it off some distance a mile or more and concealed it, and then several days afterwards he should go with the officers and find that watch where he said that he had placed it, I think that he knew what he was doing."
Defendant offered in evidence the following:
"State's Prison — Raleigh, N.C.
I, Chevis Herring, was convicted of the murder of Mr. F. F. Newton at Kerr Station on 28 June, 1930. My brother, Ernest Herring, was also convicted of the murder of Mr. Newton. I was tried and convicted first, and at the trial of Ernest Herring I was put on the stand by the State, and I testified that Ernest was with me and helped me kill Mr. *Page 547 
Newton. Sheriff Moore told me that when I told about it not to take all the blame on myself.
I have now sent for Mr. H. H. Hubbard, who is my lawyer, and for Mr. A. L. Butler and Mr. H. A. Grady, Jr., who are Ernest's lawyers, and I now state that Ernest was not with me at the time I killed Mr. Newton. He knew nothing about it. I saw Ernest on Thursday, 26 June, before the killing, and nothing was said about killing Mr. Newton. I did not see Ernest again until Sunday morning, 29 June, after the killing.
I killed Mr. Newton myself, and Ernest is absolutely innocent, knew nothing about it, and had nothing to do with it.
Signed. Chevis Herring.
Witness:
H. H. Honeycutt, Warden; A. O. Honeycutt."
On the trial Chevis Herring testified in part: that Ernest Herring hit Mr. Newton with a large stick, and described the killing.
The defendant made numerous exceptions and assignments of error and appealed to the Supreme Court. The material ones will be considered in the opinion.
Defendant was heretofore convicted of murder in the first degree and sentenced to be electrocuted. He appealed to this Court and a new trial was granted him. In that case we find: "To avoid repetition we may say that the evidence appearing on the present record is sufficient to carry the case to the jury. . . . Throughout the entire colloquy, Ernest Herring continually challenged the correctness of his brother's statements. He at no time declared his own complicity in the crime; and we think it was error to admit this evidence as against the present defendant. The whole conversation amounted to no more than an accusation by Chevis against Ernest, which the latter denied." S. v. Herring, 200 N.C. at p. 309.
On the present appeal, the defendant contends that the questions involved are: (1) Is it error for the court to fail to charge the jury as to the presumption of innocence of the defendant? We think not. (2) Is it error for the court to fail to define to the jury the meaning of the term "reasonable doubt?" We think not.
The defendant contends that "it is the duty of the trial judge in a proper instruction to the jury to give him the benefit of the doctrine of the presumption of innocence, and that under the settled law of *Page 548 
North Carolina this presumption is an instrument of proof and is to be treated as evidence. The defendant further contends that the failure of the court to define to the jury the meaning of the term `reasonable doubt' is likewise error, which was rendered all the more prejudicial in view of the failure to charge presumption of innocence, in that the use of the words `reasonable doubt' alone, without regard being had for the presumption of innocence, is held to be insufficient, as it presents to the jury a gauge by which to measure a condition of mind necessary for acquittal while withholding from them an instrument of proof which goes to bring the condition of mind from which reasonable doubt arises. S. v. Sears,61 N.C. 146; S. v. Knox, 61 N.C. 312; Coffin v. U.S., 156 U.S. 432." We have examined the above cases and also the following North Carolina cases cited by defendant: S. v. Woodly, 47 N.C. 276; S. v. Massey, 86 N.C. 658;S. v. Adams, 138 N.C. 688; S. v. McLeod, 198 N.C. 649; S. v.Spivey, 198 N.C. 655; S. v. Hardy, 189 N.C. 799; S. v. Sigmon, 190 N.C. 684. The brief of defendant's counsel is able and well prepared, but we see no good reason to overrule the Boswell case, 194 N.C. 260, which defendant says "is contrary to the position of the defendant in this appeal."
The first contention of defendant, is not sustained by the decision of this Court in S. v. Boswell, supra, where the matter is thoroughly considered. At p. 262, speaking to the subject: "It is obvious that if the `presumption of innocence' is evidence in favor of a defendant, charged with crime, then it would be the imperative duty of the trial judge to instruct the jury as to such presumption. The question as to whether the presumption of innocence is evidence or not has created a wide and divergent opinion among eminent writers and the courts of last resort. Dean Wigmore in his Treatise on Evidence, 2d ed., Vol. 5, sec. 2511, writes: `No presumption can be evidence; it is a rule about the duty of producing evidence. . . . But when this erroneous theory is made the ground for ordering new trials because of the mere wording of a judge's instruction to a jury, the erroneous theory is capable of causing serious harm to the administration of justice. And, because of a temporary aberration of doctrine in the Federal Supreme Court, in Coffin v. U.S., supra
(156 U.S. 432, 29 L.Ed., 481), such harm was for a time impending. A notable academic deliverance, however, by a master in the law of evidence, laid bare the fallacy with keen analysis; and it was soon afterwards discarded in the court of its origin. In some state courts the contagious influence of the original error was for a time noticeable; but sound views have gradually come to prevail in the greater number of jurisdictions."S. v. Hege, 194 N.C. 526; S. v. Leonard,195 N.C. 242. *Page 549 
In S. v. Rose, 200 N.C. at pp. 344-5, the following is said: "In its charge the court had instructed the jury that if they found the facts to be as the evidence tended to show, beyond a reasonable doubt, they should return a verdict of guilty. Having correctly imposed upon the State the burden of proof beyond a reasonable doubt, the court declined to instruct the jury that defendant was presumed to be innocent. While the court might have well complied with the request of defendant's counsel, under the authority of S. v. Boswell, 194 N.C. 260, 139 S.E. 374, we cannot hold that the refusal to give the instruction as requested was error for which the defendant is entitled to a new trial, as a matter of law."
The second contention of defendant is not sustained by the decision of this Court in S. v. Wilcox, 132 N.C. at p. 1137: "His Honor charged the jury as follows: `What is meant by the term "reasonable doubt" is, fully satisfied, or satisfied to a moral certainty. The words "reasonable doubt" in themselves are about as near self-explanatory as any explanation that can be made of them.'"
The court below charged the jury: "The State contends that the defendant murdered or aided and abetted in the perpetration of the murder of the deceased while attempting to rob the deceased; and if you are satisfied from the testimony beyond a reasonable doubt, that the defendant murdered the deceased, or aided and abetted in murdering the deceased while attempting to rob the deceased, and you are so satisfied of that beyond a reasonable doubt, you will return a verdict of guilty of murder in the first degree. . . . Now, the burden is upon the State, that is the burdenof proof is upon the State. Before you can return a verdict of guilty of murder in the first degree, you will have to find from the evidence beyond a reasonable doubt that this defendant, the prisoner, Ernest Herring, killed the deceased, not only with malice but with premeditation and deliberation. And the court charges you if you should find beyond a reasonable doubt that prior to the time the prisoner killed the deceased, he formed a fixed purpose in his mind to kill him, and pursuant to that purpose he did kill the deceased, because of the purpose in his mind, and not because of any legal provocation that was given by the deceased, then the Court charges you that he would be guilty of murder in the first degree and it would be your duty to so find."
The court below defined accurately murder in the first and second degrees; premeditation and deliberation, and malice. "As you find the facts to be from the evidence, you may render one of three verdicts, either guilty of murder in the first degree, or guilty of murder in the second degree, or not guilty. . . . Chevis Herring admits that he *Page 550 
is an accomplice in the killing or murder of F. F. Newton. It is, therefore, my duty to instruct you that it is your duty to not repose hasty confidence in the testimony of Chevis Herring. You must scrutinize the testimony of Chevis Herring carefully and cautiously; look into his testimony with care and caution, deliberately and carefully, and ascertain whether you are satisfied beyond a reasonable doubt that Chevis Herring has told the truth under oath on the witness stand in this trial relative to whether Ernest Herring killed the deceased, or aided and abetted in murdering the deceased. If you are not satisfied beyond a reasonable doubt as to the truth of Chevis Herring's testimony here on the witness stand in this trial, you cannot convict the defendant of any crime. Without the testimony of Chevis Herring, there would not have been sufficient testimony to have submitted the case to you as a jury. . . . If you are satisfied and beyond a reasonable doubt that the defendant while attempting to rob or aid and assist in robbing the deceased, killed the deceased, it would be your duty to bring in a verdict of murder in the first degree. If you are not so satisfied, but satisfied beyond a reasonable doubt that he killed the deceased with malice aforethought, it would be your duty to bring in a verdict of murder in the second degree. If you are not satisfied beyond a reasonable doubt that he committed the murder while attempting to rob, but are satisfied beyond a reasonable doubt that he committed the murder with malice, it would be your duty to return a verdict of guilty of murder in the second degree. If you are not so satisfied beyond a reasonable doubt,that is, to a moral certainty, that Ernest Herring killed the deceased or aided and abetted in killing the deceased, it would be your duty to return a verdict of not guilty."
The court below carefully, accurately and in detail gave the contentions of the State and defendant.
In S. v. Merrick, 171 N.C. at pp. 795-6, the following is written: "The authorities are at one in holding that, both in criminal and civil causes, a judge in his charge to the jury should present every substantial and essential feature of the case embraced within the issue and arising on the evidence, and this without any special prayer for instructions to that effect. Charged with the duty of seeing that impartial right is administered, it is a requirement naturally incident to the great office he holds and made imperative with us by statute law. Revisal, 535 (C. S., 564): `He shall state in a plain and correct manner the evidence in the case and explain the law arising thereon,' and a failure to do so, when properly presented, shall be held for error. When a judge has done this, charged generally on the essential features of the case, if a litigant desires that some subordinate feature of the cause or *Page 551 
some particular phase of the testimony shall be more fully explained, he should call the attention of the court to it by prayers for instructions or other proper procedure; but, as stated, on the substantive features of the case arising on the evidence, the judge is required to give correct charge concerning it. S. v. Foster, 130 N.C. 666; S. v. Barham, 82 Mo., 67;Carleton v. State, 43 Neb. 373; Simmons v. Davenport, 140 N.C. 407."
The courts below ordinarily in the charge to the jury apply the "presumption of innocence" in the interest of life and liberty, and enlarge on "reasonable doubt," "fully satisfied" or "satisfied to a moral certainty." S. v. Sigmon, 190 N.C. 687-8; S. v. Tucker, 190 N.C. 709;S. v. Walker, 193 N.C. at p. 491. When instructions are prayed as to "presumption of innocence" and to enlarge on "reasonable doubt" it is in the sound discretion of the court below to grant the prayer.
The court below told the jury "my duty is to instruct you that it is your duty to not repose hasty confidence in the testimony of Chevis Herring. You must scrutinize the testimony of Chevis Herring carefully and cautiously," etc. The court could have instructed the jury that the uncorroborated testimony of an accomplice, if believed by the jury beyond a reasonable doubt, is sufficient to convict, but the court below rightly gave the caution. This is in the sound discretion of the court. S. v.Ashburn, 187 N.C. at p. 728.
The court below told the jury that without the testimony of Chevis Herring there would not be sufficient evidence to submit the case to the jury, and if they were not satisfied beyond a reasonable doubt that Chevis Herring told the truth that Ernest Herring committed the homicide, they would return a verdict of not guilty. There was evidence to corroborate Chevis Herring. The evidence tended to show that the evening before both Ernest and Chevis Herring were at the postoffice together, and they saw deceased handling money and the two engaged in conversation. They knew the usual movements of deceased, as they lived in his neighborhood. That the deed was committed by two persons and the indications on the ground were that one was laying down in wait watching along the path the deceased usually went to dinner. That the deceased weighed 200 pounds, and that he was dragged some distance down into the bay, that the trail was about two feet wide and the indications were that a person walked on each side dragging the deceased, the grass was mashed down. Two packages of cigarettes were found in the vicinity. That tracks led from the body towards defendant's father's home, where defendant was staying. That a track with a bursted shoe, right foot, such as was worn by defendant was followed *Page 552 
to within a quarter to half a mile of defendant's home. There was evidence to the effect that defendant had a bad reputation.
When the jury returned a verdict of guilty of murder in the first degree, the record discloses: "The following took place: `Ernest Herring, stand up. You remember that before this you have been indicted for this felony by you done and committed; you have been arraigned and pleaded not guilty, and for your trial you have put yourself upon your God and your country, which country have found you guilty. What can you now say for yourself, why, according to the verdict passed against you, you should not have the judgment to die? What say you, Ernest Herring?' Ernest Herring: `Your Honor, I would like to say this. I am before God innocent, and I would say so with my hand on the Bible. I didn't do what they say I did, and I want you all to help me. I want you to pray for me.'"
From the entire record it appears that the able judge in the court below gave the defendant a fair and impartial trial. We find in the Bible the first murderer was asked: "Where is Abel thy brother? And he said, I know not. Am I my brother's keeper?" Gen., chap. 4, v. 9. For the reasons given, we find in the judgment of the court below
No error.