OF

# NORTH CAROLINA

AT

# RALEIGH

## FALL TERM, 1952

STATE v. FRANCIS DUVAL SMITH, Alias GEORGE SMITH, R. L. PASCHAL, R. L. FERRELL, J. H. ADAMS and F. B. MONEY.

(Filed 30 January, 1953.)

**1. Bribery § 2—**

Evidence in this case of one defendant's guilt of paying or delivering money or merchandise, directly and through agents, to each of defendant policemen to influence them in the performance of their duties, and of the acceptance by each defendant policeman of such payments or deliveries with intent and understanding that his actions as a police officer would be influenced thereby, *is held* sufficient to be submitted to the jury as to each defendant.

**2. Criminal Law § 52a (2)—**

The unsupported testimony of an accomplice, while it should be received with caution, if it produces convincing proof of the defendant's guilt, is sufficient to sustain conviction.

**3. Criminal Law § 52a (1)—**

On motion to nonsuit, the evidence is to be taken in the light most favorable to the State, and it is entitled to every reasonable intendment from the evidence, and every reasonable inference to be drawn therefrom.

**4. Same—**

On motion to nonsuit, defendant's evidence in conflict with that of the State is not to be considered, but defendant's evidence which explains or makes clear that which has been offered by the State may be considered.

**5. Criminal Law § 52a (2)—**

Evidence which tends to prove the fact in issue and which reasonably conduces that conclusion as a fairly logical and legitimate deduction, and not merely such as raises a suspicion or conjecture in regard to it, should be submitted to the jury.

**6. Criminal Law § 52a (6)—**

A fatal variance between *allegata et probata* may be taken advantage of by motion for judgment as of nonsuit.

**7. Conspiracy § 6—Evidence need not show that each conspirator agreed with all his co-conspirators, agreement with any one of them being sufficient.**

In this prosecution of defendants for conspiracy to offer and receive bribes, the evidence tended to show that one defendant did offer and pay bribes through an agent to each defendant policeman with intent to influence the performance of his official duties and that each policeman accepted a bribe with knowledge that it was intended to influence the performance of his duties as a police officer. *Held:* Defendants' motion to nonsuit on the ground that the indictment was for a common design among all defendants and that the evidence failed to disclose that any one policeman knew that any other of the policemen received a bribe, and that therefore there was a fatal variance between allegation and proof, is untenable, it not being necessary to prove that each conspirator conspired with all of the others but it being sufficient if he made any agreement with any one of the others showing his intention to participate in the unlawful design. Moreover, in this case there was evidence that the first defendant offered bribes not only through an agent but also directly, and that at least some of the policemen knew that the others were receiving bribes.

**8. Same—**

Direct evidence of conspiracy is not required, but a conspiracy may be established by a number of indefinite acts, which standing alone may be of little probative force, but which taken collectively point unerringly to the existence of the conspiracy.

**9. Conspiracy § 3—**

A criminal conspiracy is an unlawful concurrence of two or more persons in an agreement to do an unlawful act or to do a lawful act in an unlawful way or by unlawful means, and since the unlawful agreement itself is the crime, no overt act in the execution of the agreement is necessary.

**10. Criminal Law § 29b—**

While ordinarily evidence of guilt of a crime other than that charged in the indictment is not competent, proof of the commission of other like offenses is competent when such proof tends to show *quo animo*, intent, design, guilty knowledge or *scienter*, or to make out the *res gestae*, or to exhibit a chain of circumstances in respect to the matter on trial.

**11. Conspiracy § 5—**

In this prosecution for conspiracy to bribe police officers to afford protection for defendant's lottery operations, testimony tending to show that during the period in question defendant had paid another witness not to testify against him in a previous prosecution for gaming, *is held* competent for the purpose of showing *quo animo*, intent, design, guilty knowledge or *scienter* and also as a circumstance so connected with the offense charged as to throw light thereon, even though the bribery of the witness was not included in the indictment.

**12. Criminal Law § 37—**

Testimony that the incriminating writing in question had been destroyed lays the foundation for the introduction of testimony as to its purport.

**13. Criminal Law § 50d—**

The discretionary act of the court in ordering defendant into custody during the progress of the trial cannot be held prejudicial when the record discloses that the court was careful to do so in the absence of the jury and that there was no conduct thereafter in the presence of the jury to indicate that defendant was in custody.

**14. Criminal Law § 50f—**

Where several defendants offer evidence, the State has the right to open and conclude the argument to the jury, and the one defendant who offers no evidence may not object to the refusal of the court to permit his counsel to make the concluding argument.

**15. Criminal Law § 53j—**

Where the testimony of accomplices is introduced as substantive proof of guilt, and any corroboration of the one by the other is purely incidental, the court is not required to give any instructions in regard to corroborative evidence by accomplices.

**16. Criminal Law § 53l—**

The court is not required to give requested instructions verbatim but it is sufficient if the court give the requested instructions substantially.

**17. Same—**

The court correctly refuses to give requested instructions embodying an erroneous statement of the law.

**18. Criminal Law § 53j—**

The court's charge on the credibility to be given the testimony of accomplices *held* without error in this case.

**19. Criminal Law § 81c (2)—**

A *lapsus linguae* which, when the charge is construed contextually, could not have misled the jury, will not be held for prejudicial error.

**20. Criminal Law § 53j—**

Instructions of the court in one part of the charge as to the credibility to be given the testimony of accomplices, and in a subsequent part of the charge as to the credibility to be given the testimony of witnesses generally, *held* not to result in misleading or inconsistent statements, the charge being read contextually.

**21. Conspiracy § 7—**

An instruction defining conspiracy as an agreement to do an unlawful thing or an agreement to do a lawful thing in an unlawful manner, with further instructions that the jury must find that at least two of defendants combined and agreed in order to constitute the offense of conspiracy, *is held* sufficient, in the absence of request for special instructions.

**22. Criminal Law § 53j—**

A requested instruction at variance with the evidence in the case is properly refused.

**23. Criminal Law § 53f—**

The fact that the court necessarily takes more time in giving the contentions of the State than in giving those of the defendants will not be held for error when the court gives equal stress to the contentions of both parties and instructs the jury that the fact that it had taken longer to give a summary of the State's evidence than that of defendants was to be given no significance.

**24. Bribery § 2: Conspiracy § 7—Instruction in this prosecution for conspiracy and bribery held without error when construed as a whole.**

In this prosecution of one defendant for conspiracy to bribe and with bribery, and of the other defendants, policemen, for conspiracy to receive bribes and with receiving bribes, the charge of the court construed contextually *is held* not to instruct the jury that if it should find any two of defendants guilty it might find all the others guilty, it appearing that while the charge was not as full as might be desirable, the court correctly instructed the jury that a conspiracy required the concurrence of two or more persons in the unlawful scheme and that the first defendant could not be convicted of giving a bribe to any one of the other defendants unless such other defendant was convicted of accepting same with knowledge that it was intended to influence his official conduct, and the jury being further instructed as to the presumption of innocence as to each defendant with the burden upon the State to prove guilt beyond a reasonable doubt.  G.S. 1-180.

APPEALS by defendants from *Pless, J.,* February Criminal Term, 1952, of GUILFORD (Greensboro Division).

Criminal prosecution on an indictment containing nineteen counts, which may be summarized as follows:

*Count One*—That on or about 1 January, 1945, as well before as after that date, the defendants Smith, Paschal, Ferrell, Adams and Money did with common design, confederate, scheme, agree and conspire together and with each other and divers other persons, to unite for the common object and purpose of offering and receiving bribes by police officers of the City of Greensboro, said bribes being in the form of money, whiskey, groceries and other things of value and received by Paschal, Ferrell, Adams and Money to influence them in the performance of their duties as police officers of the City of Greensboro.

*Count Two*—That on or about 1 June, 1944, Smith, directly and through his agents, paid Paschal a bribe of $100.00 to influence him in the performance of his duties as a police officer.

*Count Three*—That on or about 15 February, 1947, in furtherance of said conspiracy, Smith, directly and through his agents and co-conspirators, paid Paschal a bribe of several monthly payments of approximately

STATE v. SMITH.

$80.00 with intent to influence him in the performance of his duties as a police officer.

*Count Four*—That on or about 1 January, 1948, Smith, in furtherance of said conspiracy, directly and through his agents and co-conspirators, at various times and places, delivered money, whiskey and other things of value to Paschal as a bribe with intent to influence him in the performance of his duties as a police officer.

*Count Five*—That on or about 1 January, 1948, Smith, in furtherance of said conspiracy, through his agents and co-conspirators, over a period of about one year, delivered food, meat and other groceries to Ferrell as a bribe with intent to influence him in the performance of his duties as a police officer.

*Count Six*—That on or about 24 December, 1949, Smith, in furtherance of said conspiracy, directly and through his agents and co-conspirators, paid a bribe of $50.00 and one bottle of whiskey to Ferrell, with intent to influence him in the performance of his duties as a police officer.

*Count Seven*—That on or about 1 September, 1948, Smith, in furtherance of said conspiracy, directly and through his agents and co-conspirators, from time to time over a period of about six months, delivered two or more bottles of whiskey each month as a bribe to Adams, with intent to influence him in the performance of his duties as a police officer.

*Count Eight*—That on or about 24 December, 1949, Smith, in furtherance of said conspiracy, directly and through his agents and co-conspirators, paid $100.00 and two bottles of whiskey as a bribe to Adams, with intent to influence him in the performance of his duties as a police officer.

*Count Nine*—That on or about 1 June, 1947, Smith, in furtherance of said conspiracy, directly and through his agents and co-conspirators, delivered over a period of about three years, two or more bottles of whiskey per month as a bribe to Money with intent to influence him in the performance of his duties as a police officer.

*Count Ten*—That on or about 20 December, 1949, Smith, in furtherance of said conspiracy, directly and through his agents and co-conspirators, paid $100.00 as a bribe to Money, with intent to influence him in the performance of his duties as a police officer.

*Count Eleven*—That Paschal accepted the bribe described in Count Two with the intent and understanding that his actions as a police officer would be influenced thereby.

*Count Twelve*—That Paschal accepted the bribe described in Count Three with the intent and understanding that his actions as a police officer would be influenced thereby.

*Count Thirteen*—That Paschal accepted the bribe described in Count Four with the intent and understanding that his actions as a police officer would be influenced thereby.

*Count Fourteen*—That Ferrell accepted the bribe described in Count Five with the intent and understanding that his actions as a police officer would be influenced thereby.

*Count Fifteen*—That Ferrell accepted the bribe described in Count Six with the intent and understanding that his actions as a police officer would be influenced thereby.

*Count Sixteen*—That Adams accepted the bribe described in Count Seven with the intent and understanding that his actions as a police officer would be influenced thereby.

*Count Seventeen*—That Adams accepted the bribe described in Count Eight with the intent and understanding that his actions as a police officer would be influenced thereby.

*Count Eighteen*—That Money accepted the bribe described in Count Nine with the intent and understanding that his actions as a police officer would be influenced thereby.

*Count Nineteen*—That Money accepted the bribe described in Count Ten with the intent and understanding that his actions as a police officer would be influenced thereby.

## STATEMENT OF THE CASE.

It was stipulated between the solicitor and counsel for all the defendants that the City of Greensboro is a municipal corporation formed under the laws of the State of North Carolina, and has been such continuously since 1805; that the defendant F. B. Money was a duly sworn and acting police officer of said city from January, 1934, and continuously thereafter until 9 November, 1950; that the defendant R. L. Paschal was a duly sworn and acting police officer of said city from 20 August, 1936, and continuously thereafter until 9 November, 1950; that the defendant R. L. Ferrell was a duly sworn and acting police officer of said city from 1 January, 1939, and continuously thereafter until 9 November, 1950; and that the defendant J. H. Adams was a duly sworn and acting police officer of said city from 16 November, 1944, and continuously thereafter until 9 November, 1950; and that all four were police officers of said city from 16 January, 1951, until 14 August, 1951.

The principal witnesses for the State were C. A. (Shug) York, a "finger man" or an eliminator of competition for Smith, a donor of gifts of money and whiskey to police officers for Smith, his chauffeur and general handy man; and W. C. Coble, a headman for Smith, at first an organizer of "sub writers" and "head writers," and donor for Smith of whiskey and groceries at his store. York and Coble at the time of the trial were serving time for violating the lottery laws of the State. Both had been convicted several times before for violating the criminal law.

---

STATE *v.* SMITH.

---

Neither Paschal, Ferrell, Adams or Money ever arrested Smith, Coble or York for lottery operations.

EVIDENCE AGAINST FRANCIS DUVAL SMITH, ALIAS GEORGE SMITH.

From about 1940 until 1950 and later, Smith, as banker, was operating butter and eggs and race horse lotteries in Greensboro of colossal size. York pleaded guilty in Superior Court before Judge Clement for operating a lottery in 1949. He made out he was the banker, taking the "rap" for Smith at his instructions. At this trial York testified Smith is still the kingpin; that the defendant Adams got some of his, York's, writers and "Adams and Smith was the basis of it." In 1940 the average daily take to the bank was $700.00 or $800.00 or maybe $900.00. York testified he had seen the take in the neighborhood of $5,000.00 per day coming to Smith as banker after "the writer" had deducted his 25% commission and the headman his 10% to 15%. During the years 1943 up to 1948, it probably averaged somewhere close to $4,000.00 per day. Smith had five or six "headmen" all the time, 200 to 300 "writers" and "pick-up-men." The *modus operandi* of the butter and eggs lottery is described below. The "writers" collected the money bet, and wrote tickets—the "writer" and player each getting a copy of the ticket. The writer then turned over the money collected, less his commission, to a "headman," who in turn turned it over, less his commission, to a "pick-up man." The "pick-up man" carried the money to the bank. The player selects a number of 3 digits, which is written on the ticket. The lead number of the winning number is taken from the number of tubs of butter sold that day on the Chicago market. The first figure to the right of the thousand mark comma is the first digit of the winning number. To illustrate, if 450,309 tubs of butter were sold, the first digit of the winning number would be 3. The second and third digits of the winning number are taken from the first and second digits to the right of the thousand mark comma of the number of crates of eggs sold that day on a certain market. If 876,421 crates were sold, the second and third digits of the winning number would be 4 and 2. The winning number for the butter and eggs lottery that day would be 342. Quotations as to the tubs of butter and crates of eggs sold are received from Western Union and are published in the daily papers. The player can play several numbers. If so, all are written on the same ticket. The winning number paid off 500 to 1, with some exceptions. Double numbers like 442 paid off 400 to 1; triple numbers like 444 paid off 300 to 1. The chance of selecting a winning number was one out of a thousand.

In 1940 York started a small lottery. He was banker, and had a few "writers." In about a month ten of his "writers" were arrested. Shortly

after York saw Smith at a filling station; Smith came to his car laughing, and asked how he was getting along. York told him he was not doing so well; he was losing "writers." Smith replied: "Don't you know you can't buck me? Me and my brother have got too much money." After further talk there, York went to work for Smith in his lottery operations. York worked for Smith from 1940 until January, 1949. He quit for two weeks, and went back to work for Smith until he broke with him in 1950. York received $60.00 a week and $2,500.00 bonus every six months beginning about 1945. He received the bonus about four years. York performed many duties for Smith. He was his "finger man." In lottery argot the "finger man" puts the finger on rival competitors and subordinates, and has them arrested and tried. A "finger man" is also called "an enforcer." Smith told York to give whiskey and money and favors to police officers, as he could not operate profitably without protection; if he could not contact him (Smith) to use his own judgment in such transactions. Smith told York "for years that Money was all right, and wouldn't bother the operations, unless he had to do so. As far back as 1945 and many times since he also said that I need not be afraid of Adams, as he was his man . . . Smith made these same statements in reference to Ferrell and Paschal."

Coble operated a grocery store in the Negro section of Greensboro. When he met George Smith in December, 1940, he was engaged in lottery operations with George's brother, Dutch Smith. Coble worked for George Smith in his lottery operations from 1940 until December, 1948. George Smith, as banker, also operated from 1940 through 1948 and later a race horse numbers lottery. The only difference in the race horse lottery and the butter and eggs lottery is the method of obtaining the winning number. The figures in the race horse lottery were derived from the pari-mutuel odds on horse races at a certain track, as carried in the racing papers.

Coble's store "was more or less general headquarters for the lottery, for all 'headmen' to congregate there, also a lot of police officers." Coble kept what he called a "Jeep Account" of two to three or four or five hundred dollars a month from monies received by him for Smith in his lottery operations. Coble paid out money to police officers, and delivered groceries and whiskey to police officers charging all to the "Jeep Account." He gave Smith itemized statements of all these acts.

The State's witness R. A. Craig was in Smith's house in or near Greensboro in 1947, and saw an account or record book there. In this book Craig saw "a notation on Jeep for $80.54." The witness believed he saw the entry twice.

Smith told Coble that Dutch (his brother) did not know how to run the town—he was afraid to give away anything; that you had to give stuff,

---

---

whiskey, to police officers to keep them from catching so many people. Smith told Coble to give whiskey to police officers. Coble did, and Smith paid for the whiskey.

### EVIDENCE AGAINST R. L. PASCHAL AND SMITH.

*Counts One, Two and Eleven*—In about 1944 Smith told York, his "finger man," another bank had opened up, and asked him to check on it. Smith said he understood a "fellow Wells" was banker. York investigated, and told Smith what he had learned. Smith replied: "Knock the pick-up man off, Wells or anybody. I had rather have Wells, but he can wait a day or two." York asked Smith "whom do you want to use for the knock-off, what officer?" Smith replied: "Well, how about that Paschal? As much money as he has been getting, and all, he would make a good man to catch him." Smith told him to contact Paschal. This conversation was admitted against Smith alone. York called Paschal, and met him on Forbis Street. He had two or three meetings there with Paschal. York told Paschal that they had a pick-up man lined up of the new bank that Smith wanted knocked off. Paschal replied: "I'm getting damn tired of doing George's dirty work without ample pay" or something to that effect; and further said: "Tell George I want some money." York replied he would tell Smith anything he wanted him. to. It was agreed there, to York's best recollection, that Paschal would accept $100.00. York called Smith. Smith replied: "Go ahead, and give it to him. He ain't nothing but a damn leech noway." Then York met Paschal, and told him this pick-up man could be caught on the corner of Lindsay and Forbis Streets. In the next day or two Paschal caught this pick-up man, and York gave Paschal $100.00 of Smith's money. Smith planted a man in Wells' outfit, and the officers caught five or six of Wells' writers. A week or ten days after Paschal caught the pick-up man, Wells was picked up by the officers. On the morning the writers were picked up, Wells' house was searched by the officers, and Paschal was in the raid. Paschal's conversation with York was admitted against Paschal alone.

*Counts One, Three and Twelve*—In 1946 Paschal came by Coble's store, and told Coble that Smith had promised him something, and he couldn't get it straightened out. Paschal said he would see York. He further said: "I went into it with both of them together. I'll see Shug, and see if he can get it straightened out. If he don't, I'll come back and talk to you." In a day or two Paschal returned, and said he couldn't get anything out of Smith or York. Coble replied: "Tell me what it is, maybe I can help you." Paschal said they had promised him an automobile for knocking out an "opposition banker, opposition bankers"; that

Smith "had offered him a car if he would knock out opposition bankers." Paschal said he had already done the job, and they didn't want to come across with the car. Coble called Smith, and asked him about it. Smith replied: "Yes, I promised him a car, but I am not going to pay cash for it. I will buy it, and pay monthly payments." A day or two later Paschal met Smith at Coble's store. They went out of the store for twenty or thirty minutes. When they came back, Smith told Coble he had it straightened out; that he was going to buy the car, and make the payments. The payments were $80.00 and some cents a month. Smith told Coble to take the payments out of Smith's money from the afternoon races. Once a month, between 15 and 18 months, Paschal came to the store, and Coble gave him the payments. Smith told York he had bought Paschal a Plymouth car. After Paschal's car was paid for Smith asked York to get in touch with Paschal, and see if he could not get Paschal to stop getting payments. York talked with Paschal, and Paschal said he had only received one payment since the car was paid for—$70.00 or $80.00—and he had done a lot of favors for Smith. This money was charged to the "Jeep Account." Smith's conversation was admitted against him alone. Paschal's conversation was admitted against him alone.

*Counts One, Four and Thirteen*—During the period immediately before and after 1 January, 1948, York got money from Smith for Paschal twenty-five or more times. Every ten days or two weeks Paschal would contact York for money. York would call Smith. If he could not reach him, he used his own judgment about giving it to him. Smith told York not to make Paschal mad; he was a dangerous man. This was admitted against Smith alone. The payments ranged from $25.00 to $50.00 to $75.00, and possibly $100.00. York gave Paschal whiskey from 1942 or 1943 as long as he was in Smith's employ. Smith paid for the whiskey. Paschal would never go over two weeks during the years York worked for Smith without getting whiskey—usually a bottle, sometimes two. Around 1946 Paschal got York to get $100.00 from Smith to pay off a bad cheque of Paschal's. Smith gave York $100.00; York gave Paschal $75.00 and pocketed $25.00. Coble gave Paschal whiskey a number of times. It was paid for by Smith's money and charged to the "Jeep Account." Smith told Coble in 1946 or 1947 he was giving away whiskey three ways; Coble was giving it away, York was, and he was.

### EVIDENCE AGAINST R. L. FERRELL AND SMITH.

*Counts One, Five and Fourteen*—Smith told York that Ferrell was getting groceries and occasionally liquor, and that he, Smith, was paying for it. Smith further told York that Ferrell was on our side, and

wouldn't bother York or any of the lottery operators connected with him. Smith made this statement over and over. These statements of Smith were admitted in evidence against Smith alone. York testified that he observed Ferrell getting groceries at Coble's store, but did not ever see him pay for any; that Ferrell was there practically every time he went there. Coble testified that somewhere in the neighborhood of a year or a little better of 1947, or the last of 1946, Ferrell came to him, and told him he was having it pretty tough; to see if he couldn't get a few groceries; that he understood some of the rest of them were getting a few things—he didn't say what. Coble asked him what he was referring to. Ferrell replied: "Well, I understand some of the other policemen are getting whiskey, groceries and cars. It looks like you could give me a few groceries." Coble discussed with Smith the giving of groceries to Ferrell before doing so. Smith told Coble to let him have groceries. Smith said of Ferrell: "He's catching a lot of people down there. We had better give him a few groceries, and kind of cool him off a little." Then Coble started to furnishing Ferrell groceries. Ferrell started off with about $25.00 or $30.00 a month for about a year; in one month got up to about $80.00. When it got up to $80.00, Smith said: "I thought he didn't want but $25 or $30.00 of groceries." Coble replied: "I can't stop him; you put him on there. If you want him stopped, you see him and stop him." Coble spoke to Ferrell about it. Ferrell replied: "Last night I overlooked two down there. If I had caught them, it would have cost you more than what these few groceries I got cost." Coble told that to Smith, who replied: "Don't say no more to him about it." Ferrell got groceries from Coble until they closed down in December, 1948. Smith's conversation was admitted against him alone.

*Counts One, Six and Fifteen*—On Christmas Eve, 1949, York parked his car in the back of Coble's store. Ferrell came out the back door. York gave Ferrell a bottle of whiskey and $50.00 in money, saying: "Here is a further present for you; George has always told me to look out for you fellows all I could." The money and whiskey were Smith's property. Ferrell thanked him, saying he would see him later; the place was hot, police officers were in the store; and he was going away as quick as he could.

### EVIDENCE AGAINST J. H. ADAMS AND SMITH.

*Counts One, Seven and Sixteen*—Around 1 September, 1948, Coble gave Adams whiskey on a number of occasions. Sometimes Adams would come in Coble's store kidding about the numbers and say: "What kind of day did you have? Were you overhit, or did you make money?" Coble would reply he didn't know what he was talking about. Then Adams would say: "What about a bottle or two? I am kind of dry. I need

one." Coble would give him a bottle or two of whiskey—this took place over a period of five or six months. It was Smith's whiskey, and Smith knew what Coble was doing with reference to Adams. Coble charged this whiskey to the "Jeep Account." For about six months Coble gave Adams a bottle or two of Smith's whiskey per month.

*Counts One, Eight and Seventeen*—On Christmas Eve, 1949, after York had seen Ferrell back of Coble's store, he went into the store and saw Adams and police officer Tillman. It was about 3 or 4 p.m. Adams asked York to go in the back and take a drink with him. York, in taking the drink, saw the brand of whiskey was similar to the brand of a case of whiskey of Smith's York had furnished Coble's store the day before. Adams said to York that Tillman and himself had been given a bottle of whiskey there, and he needed more liquor Christmas; and asked York if he had some. York replied: "Yes, at home." York went to his home, and Tillman and Adams followed. Tillman remained outside in the car. Adams went in the house. He asked if there was a dictaphone in the room. York replied: "No." York gave him four bottles of whiskey and $100.00 in money, which belonged to Smith. Adams went to the car carrying the whiskey and money. Tillman testified he was a police officer of the City of Greensboro in 1949, and still was. On Christmas Eve, 1949, he was off duty, and he and Adams then went to Coble's store, and went in. He saw York there. A good crowd was there—whites and Negroes. When they left Adams said to Tillman: "Let's go by York's house, and get a bottle of whiskey." He drove to York's house. Adams went in, and came back with some whiskey—either two or three bottles in two packages. Tillman got a bottle of the whiskey. In November, 1950, York was a witness in Superior Court in Greensboro, and mentioned Adams. Adams told Tillman he wasn't going to admit any of it. Tillman told Adams he didn't see any use denying these meetings. Tillman was interrogated by the S. B. I. He told Adams he had told them what he knew. That seemed to make Adams mad. He said what would the Chief and his wife think, and left. As far back as 1945 Smith told York, and many times since, not to be afraid of Adams, as he was his man. This was admitted against Smith alone.

## EVIDENCE AGAINST F. B. MONEY AND SMITH.

*Counts One, Nine and Eighteen*—At Smith's direction York gave Money whiskey about once a month, and at times left it at Coble's store for him. Money always expressed his appreciation, and would ask about Smith; how the business was going on, and if we were being bothered too much. Smith told York for years that Money was all right, and wouldn't bother the operations unless he had to. Coble testified Money got whiskey

on numerous occasions. He would get a bottle probably once or twice a month, and then at Christmas, two. It was Smith's whiskey, and went on the "Jeep Account." Coble gave this whiskey to Money in 1946 or 1947, up until 1948. Money told Coble that during 1947 or 1948 he could have arrested him several times for operating a lottery; he had been in his store several times when he was taking the "low" down over the telephone. In lottery slang the "low" means the total amount written by the writer less his 25%. In 1948 York saw Money with a crowd at Smith's house. There was an atmosphere of drinking. The conversation of Smith was admitted against him alone. The conversation of Money was admitted against him alone.

*Counts One, Ten and Nineteen*—In Christmas week, 1949, York was still engaged in lottery operations with Smith. Early in Christmas week, 1949, Money came to York's home, just out of the city limits of Greensboro, and asked him how everything was going along. York replied pretty good, and "I guess you want a little liquor." Money replied: "yes." York gave him two bottles of whiskey and $100.00 in money—Smith's property. Money asked York how business was, how I was getting along, and if anybody was bothering me much. York replied, things were not too bad. Money thanked him for the whiskey and money, saying he would be glad to do anything for me he could.

The defendant Smith offered no testimony.

#### EVIDENCE FOR THE FOUR POLICE OFFICERS, DEFENDANTS.

Paschal, Ferrell, Adams and Money denied *in toto* the charges against them in the indictment and also all statements the State offered evidence they had made. Each one testified that they did not know Smith, and had received no money, whiskey, groceries or anything of value from him directly or through any agents or co-conspirators. Paschal offered evidence to show how he financed the purchase of the automobile, which the State contends Smith paid for. They offered evidence that after York's testimony in his lottery case in reference to the police officers, that Coble, on or about 20 December, 1948, made an affidavit in the presence of Sgt. Evans, S. B. I. Agent Allen, Sgt. Sink and Deputy Sheriff Donovant, stating that he knew nothing of the police officers receiving any money, whiskey or groceries from Smith or his agents, or anyone else, directly or indirectly. Each one of the four defendants offered numerous witnesses that he was a man of good character. There was evidence that York had received a "time cut" on his road sentence, and that Coble was seeking one.

The evidence for the State has been set forth in more detail because of the motions for judgment of nonsuit.

The jury found for its verdict that each defendant was guilty as charged. The defendants thereupon moved that the jury be polled. The court polled the jury, and each juror for himself answered that each defendant is guilty on all counts as charged in the bill of indictment.

From the judgments imposed on each defendant, each defendant appeals, and assigns error.

*Attorney-General McMullan and Assistant Attorney-General Bruton for the State.*

*Jordan & Wright, Hines & Boren and Don A. Walser for defendant Francis Duval Smith, alias George Smith.*

*T. Glenn Henderson and Norman A. Boren for defendants R. L. Ferrell, R. L. Paschal, F. B. Money, and J. H. Adams.*

PARKER, J. At the close of the evidence for the State, the defendant Smith moved for judgment of nonsuit on counts 1 through 10, inclusive, in the bill of indictment; and as to each of said counts. The motion was refused as to all said counts, and the defendant Smith excepted. The defendant Smith introduced no evidence. The other four defendants did introduce evidence. After all the evidence in the case had been concluded, the defendant Smith again moved for judgment of nonsuit on counts 1 to ten, inclusive, and on each one of them. The motion was refused and the defendant Smith excepted. However, in his brief the "defendant Smith concedes that the State's evidence, when viewed in the light most favorable to the State, was sufficient to repel the motions for judgment as of nonsuit upon counts 2, 3, 4, 5, 7 and 9. Hence, the exceptions to the overruling of the demurrer to the evidence and motions for judgment as of nonsuit on these counts are abandoned. On the other hand, it is submitted that the evidence was insufficient to be submitted to the jury upon counts 1, 6, 8 and 10. We can perceive that there might be some difference of opinion as to counts 6, 8 and 10, although we believe the conviction on these counts should be set aside and reversed." Without repeating the evidence on counts 6, 8 and 10, set forth above, it was amply sufficient to overcome the defendant Smith's motion for judgment of nonsuit.

At the close of the State's evidence the defendant Paschal moved for judgment of nonsuit upon counts 1, 11, 12 and 13; overruled and Paschal excepts.

At the close of the State's evidence the defendant Ferrell moved for judgment of nonsuit upon counts 1, 14 and 15; overruled and Ferrell excepts.

At the close of the State's evidence the defendant Adams moved for judgment of nonsuit upon counts 1, 16 and 17; overruled and Adams excepts.

At the close of the State's evidence the defendant Money moved for judgment of nonsuit upon counts 1, 18 and 19; overruled and Money excepts.

At the close of all the evidence the defendants Paschal, Ferrell, Adams and Money renewed their motions for judgment of nonsuit; overruled and exceptions by all four defendants.

Paschal, Ferrell, Money and Adams filed with us a joint brief. Their brief states: "The defendant policemen concede that there was sufficient evidence to submit to the jury on the alleged overt acts of receiving bribes, as charged in counts 11 through 19, inclusive, of the bill of indictment, if the otherwise uncorroborated testimony of two accomplices is sufficient to make out a case for the jury. However, the defendant policemen stressfully urge and contend that there was a total failure of proof sufficient to carry the case to the jury on the charge that they entered into a conspiracy with Smith, and it is submitted that the motions for judgment as of nonsuit on the conspiracy count should have been granted." "It has been repeatedly held by this Court that the unsupported testimony of an accomplice, while it should be received with caution, if it produces convincing proof of the defendant's guilt is sufficient to sustain a conviction. *S. v. Ashburn,* 187 N.C. 717 (728) and cases there cited." *S. v. Gore,* 207 N.C. 618, 178 S.E. 209. To the same effect *S. v. Herring,* 201 N.C., 543, 160 S.E. 891; *S. v. Lippard,* 223 N.C. 167, 25 S.E. 2d 594; *S. v. Rising,* 223 N.C. 747, 28 S.E. 2d 221. Upon the admission of the four police officers defendants in their brief, their motions for nonsuit are untenable on counts eleven through nineteen, inclusive. Regardless of such admission there was plenary evidence on those counts to carry the case to the jury.

That leaves for our consideration the refusal of the trial court to nonsuit the State on Count One in the indictment as to all the defendants, or one or more of them.

"On a motion to dismiss or judgment of nonsuit, the evidence is to be taken in the light most favorable to the State, and it is entitled to the benefit of every reasonable intendment upon the evidence and every reasonable inference to be drawn therefrom." *S. v. Shipman,* 202 N.C. 518, 163 S.E. 657. On such a motion "the defendant's evidence, unless favorable to the State, is not to be taken into consideration, except when not in conflict with the State's evidence, it may be used to explain or make clear that which has been offered by the State." *S. v. Bryant,* 235 N.C. 420, 70 S.E. 2d 186. "The general rule is that, if there be any evidence tending to prove the fact in issue, or which reasonably conduces to its conclusion as a fairly logical and legitimate deduction, and not merely such as raises a suspicion or conjecture in regard to it, the case should be submitted to the jury." *S. v. Johnson,* 199 N.C. 429, 154 S.E. 730. A

fatal variance between *allegata et probata* can be taken advantage of by motion for judgment as of nonsuit. *S. v. Nunley,* 224 N.C. 96, 29 S.E. 2d 17.

Count One charges the five defendants with a conspiracy to commit a felony. All the defendants contend that Count One of the indictment charged that a conspiracy existed between Smith on the one hand and the four defendant police officers on the other, under which Smith agreed to give bribes to the police officers in return for an agreement on their part to protect Smith's lottery operations, and that the four police officers consented to receive, and did receive bribes for said purposes. That the evidence discloses, as the defendants contend, that none of the defendant policemen knew that any of the others were the recipients of bribes, nor is there any evidence that Smith directly communicated with any of the four police officer defendants regarding the bribes. That the evidence discloses, when viewed most favorably for the State, the bribery of the policemen was an isolated incident unrelated to the bribery of the other policemen. That while there is evidence that York and Coble gave bribes to the four police officer defendants at Smith's requests and as his agents that would only be evidence of a conspiracy by Smith, York and Coble to corrupt police officers, and does not support Count One; but is a fatal variance between *allegata* and proof. That there is no evidence from which it could be found that any systematic scheme or plan was either evolved or carried into effect with the defendant policemen to protect Smith's lottery operations.

It is not requisite to convict for the State to prove that the police officer defendants, or any one of them, knew that the others, or any of them, were the recipient of bribes. "It is not necessary, however, that a person to be criminally liable, be acquainted with the others engaged in the conspiracy; although to hold one liable as a participant, it must be shown that he did some act or made some agreement showing his intention to be a participant:" 11 Am. Jur., Conspiracy, Sec. 7. "It is not necessary to constitute the offense that the parties should have come together and agreed in express terms to unite for a common object. A mutual, implied understanding is sufficient, so far as the combination or conspiracy is concerned, to constitute the offense." *S. v. Connor,* 179 N.C. 752, 103 S.E. 79. However, there is evidence that Ferrell told Coble "I understand some of the other policemen are getting whiskey, groceries and cars. It looks like you could give me a few groceries." There is further evidence that Smith made the payments on a car for Paschal.

The defendants contend there is no evidence that Smith directly communicated with any of the police officer defendants regarding bribes. That is an oversight. There is evidence that Paschal told Coble, Smith had offered him a car if he would knock out opposition bankers; that he

had done the job, and he had not come across with the car. Coble reported this to Smith. A day or two later Paschal met Smith at Coble's store, and Paschal and Smith went out of the store for 20 or 30 minutes. When they came back Smith told Coble he had straightened it out; that he was going to buy the car, and make the payments, which he did.

The evidence discloses that York and Coble in dealing with the four police officer defendants were acting under Smith's direction and as his agents. Smith said he could not operate successfully without police protection, and to give money, whiskey, groceries and a car (the car was to Paschal alone) to these four defendants, and that they received what he directed to be given. That they never arrested Smith, York or Coble in their lottery operations. That Paschal knocked out opposition bankers. That Ferrell told Coble "last night I overlooked two down there, it would have cost you more than what these few groceries I got cost." That Adams would come in Coble's store kidding about the numbers, and say "what kind of day did you have? Were you overhit, or did you make money?" Then Adams would say "what about a bottle or two," and Coble would give him whiskey. Money told Coble during 1947 and 1948 he could have arrested him several times, when he was taking "the low" down over the telephone. Smith told York for years that Money was all right, and wouldn't bother the operations, unless he had to do so; that he need not be afraid of Adams, as he was his man; and made the same statements as to Paschal and Ferrell. What Smith told York was admitted against Smith only.

Considering all these facts and circumstances in the light most favorable to the State there was abundant evidence tending to show that all five defendants had entered into a criminal conspiracy with a common design and purpose to unite for the common object of Smith offering bribes to Paschal, Ferrell, Adams and Money, police officers of the City of Greensboro, and of the four said police officer defendants receiving said bribes with the express understanding that they would protect Smith in his lottery operations, as charged in Count One of the indictment. The evidence made out a case for the jury on that count as to all the defendants. The court was correct in refusing the motions for judgment of nonsuit made by all the defendants and each one of them on Count One in the indictment. "Direct proof of the charge" (conspiracy) "is not essential, for such is rarely obtainable. It may be, and generally is, established by a number of indefinite acts, each of which standing alone, might have little weight, but, taken collectively, they point unerringly to the existence of a conspiracy." *S. v. Whiteside,* 204 N.C. 710, 169 S.E. 711. The late *Chief Justice Stacy* speaking for the Court in *S. v. Ritter,* 197 N.C. 113, 147 S.E. 733, says: "The gist of a criminal conspiracy is the unlawful concurrence of two or more persons in a wicked scheme—the

agreement to do an unlawful act or to do a lawful act in an unlawful way or by unlawful means—and it is said that the crime is complete without any overt act having been done to carry out the agreement, citing authorities. . . . The crime of conspiracy consists of the conspiracy, and not of its execution . . . One who enters into a criminal conspiracy, like one who participates in a lynching, or joins a mob to accomplish some unlawful purpose, forfeits his independence and jeopardizes his liberty, for, by agreeing with another or others to do an unlawful thing, he thereby places his safety and security in the hands of every member of the conspiracy."

Smith's assignment of error No. One. York on re-direct examination by the State before the State rested, testified: "Earl Black was an employee of George Smith's before the round-up in December 1948. I disremember the exact date that Earl Black left George's employment, but he was in Greensboro off and on for the course of as much as three years. He was supposed to be a witness against George and the others for the State, but he failed to testify against George . . . Black was brought up here, I believe, under subpoena." The evidence shows there was a big blowup in Smith's lottery operations in December, 1948, and over 30 people connected with his lotteries were arrested. A warrant was issued for Smith charging him with violating the lottery laws. He became a fugitive from justice, and was arrested in Fayetteville in June, 1949. Smith was tried in the Municipal Court of Greensboro on these charges and fined $10,000.00. Sgt. Evans, a witness for Smith's co-defendants, testified: "The original and basic source of information in connection with that investigation" (referring to the blowup in 1948) "was Earl Black. . . . I talked to Black a week or ten days. I got a tremendous amount of information from Black. He had been in the lottery business in Greensboro with George Smith." The solicitor asked York this question:

"Q. What statements, if any, did George Smith make to you with reference to Earl Black's appearance as a witness against Smith or failure to appear?" Objection by Smith, overruled by the court, and Smith excepted. "A. George said he was supposed to pay Earl Black $4,000.00 not to testify against him, that he had already paid him $1,000.00 and that Carl Vann had $3,000.00 holding it as soon as Earl Black went through with the deal, and didn't testify."

York testified immediately thereafter without objection, "as best I can recall, the $4,000.00 also included Black being a witness against Smith in New Hanover County in Wilmington."

The question had reference to Smith's case in the Greensboro Municipal Court, when he was fined $10,000.00. The warrants in this case had not been issued against any of the five defendants here.

The defendant Smith contends that the admission of this testimony was prejudicial and material error on the ground the general rule is that evidence of one offense is inadmissible to prove another and independent crime, the two being wholly disconnected and in no way related to each other, and relies upon *S. v. Smith,* 204 N.C. 638, 169 S.E. 230; *S. v. Choate,* 228 N.C. 491, 46 S.E. 2d 476; and *S. v. Fowler,* 230 N.C. 470, 53 S.E. 2d 853.

In *S. v. Fowler, supra,* relied upon by Smith, it is said: "To this general rule, however, there is the exception as well established as the rule itself, that proof of the commission of other like offenses is competent to show the *quo animo,* intent, design, guilty knowledge or *scienter,* or to make out the *res gestae,* or to exhibit a chain of circumstances in respect of the matter on trial, when such crimes are so connected with the offense charged as to throw light upon one or more of these questions" (citing numerous authorities).

The question is squarely presented as to whether this evidence comes within the general rule or the exception to it. The evidence discloses that Smith for years had operated vast lotteries in Greensboro. After he was fined $10,000.00 in 1949, he continued to operate. York testified at the trial "George is still the kingpin," from which it could be inferred that he even then was operating. Smith told York he could not operate profitably without protection. The point at issue in this action was did Smith, directly and through his agents and co-conspirators, give money, whiskey and groceries to his co-defendants, and if so, were they bribes. The evidence objected to showed Smith paid Black a $4,000.00 bribe for protection—*i.e.,* not to testify against him in Greensboro and in Wilmington on his trials for operating lotteries. The first count in the indictment charges said bribes being offered by Smith to and received by Paschal, Ferrell, Adams and Money with the express and implied understanding that their official action and their omission to perform official acts as police officers were to be influenced thereby. Counts 2 to 19, both inclusive, in the indictment, charge the bribe being offered by Smith, and received by the defendant named in the count with the intent and understanding that his official actions would be influenced thereby. The bill of indictment charges a violation of G.S., Sections 14-217 and 14-218. Section 14-217 has as an essential element of the offense of bribery of officials the receipt of anything of value with the express or implied understanding that his official acts are to be in any degree influenced thereby. This evidence was competent to show the *quo animo,* intent, design, guilty knowledge or *scienter* with which Smith, through York and Coble, gave money, whiskey and groceries to Paschal, Ferrell, Adams and Money. In other words, it was competent to show Smith's intent in this case, and not to prove the accusations substantively. It was sufficiently

connected with the charges in this case to render it competent for this purpose. It was evidence tending to show also why the State did not call Black as a witness. It was part of a series of transactions carried out by Smith in pursuance of his original design to buy protection, and the jury might well have inferred this common purpose from the evidence. In addition, the bribing of Black not to testify exhibits a chain of circumstances in respect of the matter on trial, and so connected with the offenses charged as to throw light on these questions. The following cases are in accord with this view: *S. v. Stancill,* 178 N.C. 683, 100 S.E. 241; *S. v. Dail,* 191 N.C. 231, 131 S.E. 573; *S. v. Batts,* 210 N.C. 659, 188 S.E. 99; *S. v. Flowers,* 211 N.C. 721, 192 S.E. 110; *S. v. Smoak,* 213 N.C. 79, 195 S.E. 72; *S. v. Godwin,* 216 N.C. 49, 3 S.E. 2d 347; *S. v. Batson,* 220 N.C. 411, 17 S.E. 2d 511; *S. v. Edwards,* 224 N.C. 527, 31 S.E. 2d 516; *S. v. Biggs,* 224 N.C. 722, 32 S.E. 2d 352; *S. v. Bryant,* 231 N.C. 106, 55 S.E. 2d 922; *S. v. Summerlin,* 232 N.C. 333, 60 S.E. 2d 322. The cases of *S. v. Smith, supra, S. v. Choate, supra,* and *S. v. Fowler, supra,* are distinguishable. We hold the evidence competent, and the assignment of error is not sustained.

Smith's assignment of Error No. 3. R. A. Craig, a witness for the State, testified that in 1947 he was in Smith's house, and saw an account or record book. The witness was being examined by the solicitor for the State.

Q. Do you recall seeing any items that particularly aroused your interest?

Mr. Henderson: Objection. The record would be the best evidence.

Mr. Jordan: And whether it aroused his interest, your Honor, certainly wouldn't be material.

The Court: The objection is sustained as to the officers, and overruled as to the defendant Smith. Smith excepted. Q. What did you see? A. There was a notation on Jeep for $80.54. Q. Jeep, $80.54? A. Yes, sir. Q. Did you see more than one such entry? A. I believe I saw it twice. Mr. Jordan: The defendant Smith moves to strike that evidence. If it was a document, that would be the best evidence, and there's been no foundation laid for the introduction of secondary evidence. The Court: Objection overruled. The defendant Smith excepts.

Previously, Coble had testified: "I do not have any books on the Jeep Account; the records have been destroyed." The foundation had been laid for the introduction of secondary evidence, and the evidence is competent. *Potato Company v. Jeanette,* 174 N.C. 236, 93 S.E. 795; Stansbury N. C. Evidence, Sec. 192. In addition what he saw in this book in Smith's home was competent against Smith.

Smith's assignment of Error No. 2.

On the eighth day of the trial the court ordered the defendant Smith into custody, and increased his bond from $3,000.00 to $50,000.00. This

occurred about 12:30 p.m. on 20 February, 1952, after Smith's counsel had cross-examined Coble, but before the cross-examination of him by the police officers' counsel. York had already testified. The court called Smith's counsel to the bench (counsel on both sides had gone frequently to the bench to talk to the court of their own volition and called by the court during the trial) and quietly stated, not in the hearing of the jury, that he had decided to order Smith into custody. Counsel for Smith protested. The court stated he would direct the sheriff to take Smith into custody out of the presence of the jury. The conversation was "beyond the hearing of the jury." The jury left the courtroom; Smith remaining in the courtroom until the jury had left. The court instructed the sheriff not to walk beside Smith, but to remain a discreet distance away. Smith was then put in jail. After lunch Smith's counsel conferred with the judge in his chambers protesting his action, and saying it had seriously prejudiced Smith's case. The judge called the solicitor into his chambers. The solicitor did not know until then that Smith had been placed in custody. The court then fixed Smith's bond at $50,000.00. Before court reconvened after lunch, Smith returned with the sheriff from jail to the courtroom, and then the jury was brought from the jury room into the courtroom; Smith being seated in the chair he had occupied before. During the time Smith was in custody, on each and every occasion when he left or entered the courtroom, the jury was in the jury room and out of sight and hearing of the courtroom and the lobby between the courtroom and the public elevator. Nothing was said or done by the court or the sheriff in the presence or hearing of the jury to inform the jury that the defendant had been taken into custody and his appearance bond raised to $50,000.00. Smith was in the courtroom seated in his usual chair each time the jury entered the courtroom and he remained there until the jury left the courtroom at each recess. The jury was not kept together. On the afternoon of 14 February, 1952, Smith gave a $50,000.00 bond, and was released from custody. To this ordering of Smith into custody and increasing his bond, he excepts, and assigns as error No. 2.

"In a criminal prosecution the State is the plaintiff and may have custody of accused, this being essential for the protection of society. It is within the discretion of the trial court whether accused should be placed in custody; and the court's proper exercise of discretion is not error where the jury were unaware that accused had been placed in custody, or were not influenced by that fact." 23 C.J.S., Criminal Law, Sec. 977.

In *S. v. Smith,* 202 N.C. 581, 163 S.E. 554, the court ordered the defendant into custody during the trial. This Court said: "The conduct of the defendant called for drastic action. His continued absence impeded the trial. The judge states that he made 'every possible effort to

assure the defendant of able counsel and a fair trial, but the defendant did not seem to appreciate the effort or to respect the court.' It does not appear that the jury knew anything of the order or of the commitment of the defendant; the finding of the court is to the contrary. Under the circumstances the order was within the exercise of legitimate power and affords no sufficient ground for a new trial."

In *Hood v. U. S.,* C.C.A. Okl., 23 F. 2d 472, *certiorari* denied 48 S. Ct. 436, 277 U.S. 588, 72 L. Ed. 1002 (trial for a conspiracy to engage in transactions involving morphine) the Court said: "The demand for the exclusion of witnesses and the committal of defendant Bowdry to the custody of the marshal were matters addressed to the sound discretion of the trial court, and we do not find that the discretion was abused." See Bishop's New Crim. Proc., Sec. 952a.

The defendant Smith in his brief relies upon *S. v. Hart,* 186 N.C. 582, 120 S.E. 345; *S. v. McNeill,* 231 N.C. 666, 58 S.E. 2d 366; *S. v. Simpson,* 233 N.C. 438, 64 S.E. 2d 568; *S. v. Wagstaff,* 235 N.C. 69, 68 S.E. 2d 858. The facts in those cases are distinguishable. In the *Hart* case the defendant in the presence of the jury was ordered into custody by the court. In the *McNeill* case a defendant's witness immediately upon leaving the stand and in the presence of the jury was ordered into custody by the court. In the *Simpson case* immediately after recess for lunch, some of the jurors being still in the courtroom, the court ordered the defendant and two of his witnesses into custody, and they were placed in jail. When the court reconvened, the jury being in the box, the defendant and his two witnesses were brought into the courtroom in custody of the sheriff. In *Wagstaff's case* the 19 year old defendant was without counsel. The court ordered his father into custody in the presence of the jury, and removed from the courtroom—the defendant needing the counsel of his father, and his father being a probable witness for his son.

"In the absence of constitutional or statutory provisions to the contrary, the general rule is that the inherent power of the court to insure itself of the presence of the accused during the trial may, in its discretion, be exercised so as to order a person who has been at liberty on bail, into the custody of the sheriff during trial of the case . . . It is not necessary for the court, in exercising its discretionary power to remand during trial, to file any reasons for such action; and if such order is made, it must be assumed, in the absence of a contrary showing, that the court acted in good faith and upon sufficient grounds." 6 Am. Jur., Bail and Recognizance, Sec. 101.

Just before the court recessed for the day 13 February, 1952, the court instructed the jury: "Please remember the instructions of the court not to discuss this case with anybody, and please do not read the newspapers.

Don't let your wife tell you what is in them; just go right along, and form your own opinions. Keep your minds open, etc."

Before Smith was placed in custody it was already in evidence that a warrant had been issued in December, 1948, against Smith for operating a lottery by the Municipal Court of Greensboro; that in spite of efforts to arrest him, he was not picked up until June, 1949, in Fayetteville; that Smith had paid Black a bribe of $4,000.00—or at least $1,000.00 and placed $3,000.00 in escrow when he went through with his agreement—not to testify against him in 1949 and in Wilmington; that in 1950 York had pleaded guilty, and taken the "rap" for Smith, at his request. Smith was placed in custody not in the presence of the jury, and in going to and from jail, while he was in custody, there was nothing to indicate he was in custody. Considering all the facts and circumstances the judge did not abuse his discretion in placing Smith in custody and in increasing his bond to $50,000.00, which Smith gave next day— the court in good faith and upon sufficient grounds deeming his act essential for the protection of society. This assignment of error by Smith is not upheld.

The defendant Smith assigns as error No. 5 the refusal of the court to permit his counsel to make the concluding argument to the jury. Smith offered no evidence, but his four co-defendants testified for themselves, and introduced the evidence of a number of witnesses in their behalf. That gave the State the right to open and conclude the argument, and this assignment of error is untenable. *S. v. Robinson,* 124 N.C. 801, 32 S.E. 494; *S. v. Raper,* 203 N.C. 489, 166 S.E. 314; *Hamilton v. R. R.,* 200 N.C. 543, 158 S.E. 75.

## ASSIGNMENTS OF ERRORS TO THE CHARGE.

Smith requested the court to give 17 prayers for instructions plus 4 additional prayers, covering seven pages in the Record; his four co-defendants requested none. Smith's assignment of error No. 6: "The trial judge erred in charging the jury on the law applicable to the testimony of accomplices, failing to give the requested instructions on this subject and on whether there was any corroborating evidence, and, if so, its legal significance." Paschal, Ferrell, Adams and Money assign as their Error No. 3: "Did the court err in charging the jury with reference to the testimony of the State's witnesses who were accomplices, and was there error in giving conflicting instructions on this aspect of the case?" Smith filed a brief with us, and his four co-defendants a separate joint brief. On these two assignments of error the argument is substantially the same in both briefs, and both briefs cite many times the same authorities. The State had five witnesses. All the defendants contend that of

these five witnesses only York and Coble were accomplices. The testimony of York and Coble was offered by the State as substantive evidence. If they corroborated each other, it was only incidentally. None of the defendants requested that the court instruct the jury that any of the testimony of York or Coble be considered as corroborative evidence, nor did the court do so.

The court refused to give Smith's prayer No. 3 verbatim, but gave it substantially in his charge.

All the defendants assign as error the court's refusal to give Smith's prayer 4: "In order to constitute corroborating evidence, the jury must be satisfied beyond a reasonable doubt that the facts relied upon as corroborating evidence existed or have been proven beyond a reasonable doubt, the burden being upon the State, and unless the jury so find they cannot consider the evidence as corroborating, and therefore would reject the same. In other words, evidence is not corroborative unless it does actually corroborate." And also the court's refusal to give Smith's prayer for additional instruction as follows: "The court charges the jury that the testimony of one accomplice cannot be used to corroborate that of another. Under the facts of this case the court charges you cannot consider the testimony of York to corroborate the testimony of Coble, or the testimony of Coble to corroborate the testimony of York. The court charges you that York and Coble are accomplices and you cannot consider the evidence of York to corroborate that of Coble, or Coble's testimony to corroborate that of York. Evidence of a number of accomplices needs the same amount of corroboration as that of one accomplice."

Prayer 4 is taken from the charge in *S. v. Ashburn, supra.* Ashburn excepted to this part of the charge, saying he made no such contention. The Court said: "If the defendant made no such contention, he should have called the court's attention to it, so that correction could be made at the time." The court did not lay this part of the charge down as a rule of law. Suffice it to say that the court in its charge in this case substantially followed the law laid down in the *Ashburn case,* relating to the testimony of an accomplice repeating many expressions there verbatim; and also following the law on the same subject expressed in *S. v. Williams,* 185 N.C. 643, 116 S.E. 570; *S. v. Kelly,* 216 N.C. 627, 6 S.E. 2d 533. The exception to the refusal to give Prayer 4 is not sustained. The four additional prayers were taken apparently from 22 C.J.S., Crim. Law, p. 1408, where it is said: "The general rule is that the testimony of one accomplice cannot be accepted as sufficient corroboration of the testimony of another; and hence, there can be no conviction on the testimony of accomplices alone, no matter how many there may be, if their testimony is not corroborated by evidence apart from accomplice testimony." This statement of the law in C.J.S. is at variance with our decisions. *S. v.*

*Gore, supra.* The refusal of the court to give these four additional prayers was not error.

The court did not give Prayers 5 and 6 verbatim, but it did give them substantially in its charge, and in accordance with our decisions.

All the defendants assign as error that part of the court's charge between the letters G and H, and covering about two pages of the Record, pp. 283, 284 and 285, relating to the credibility of the testimony of accomplices in lieu of giving Smith's prayers for instruction on that subject, and particularly to this sentence: "The evidence of an accomplice is undoubtedly competent, and may be acted on by the jury as a warrant to convict—although entirely supported." The two sentences in the charge immediately before this sentence, this sentence, and the three sentences immediately thereafter were Smith's prayer for instructions No. 2 given verbatim except supported for unsupported. Two of these last three sentences are: "The court instructs you that you may convict on the unsupported testimony of an accomplice, but that it is dangerous, etc. . . . Before the defendants can be convicted upon the unsupported testimony of an accomplice, etc." Reading the charge as a whole the use of the word "supported" instead of "unsupported" was a *lapsus linguae,* or as the philosophers say "heterophemy." It could not have misled the jury, and cannot be held material prejudicial error. *S. v. Truelove,* 224 N.C. 147, 29 S.E. 2d 460. The charge is to be construed contextually, and not by detaching a sentence or clause from its appropriate setting. *S. v. Utley,* 223 N.C. 39, 25 S.E. 2d 195.

That portion of the charge between the letters G and H is in conformity with *S. v. Williams, supra; S. v. Ashburn, supra;* and *S. v. Kelly, supra.* The assignments of error thereto are not sustained.

All the defendants assign as error that later on in the charge the court gave the law in respect to the credibility of witnesses generally, and this was in conflict with the charge previously given as to the testimony of accomplices and was misleading and inconsistent. The defendants offered the testimony of 36 witnesses besides testifying themselves. This part of the charge as to witnesses' credibility generally comes over six pages in the Record after that on the credibility of accomplices. At the close of the court's charge, counsel for Smith stated to the court: "In the solicitor's closing argument he made reference that the defendants' testimony should be scrutinized, which was correct, but he likewise said that only York's and Coble's testimony should be scrutinized. We think your Honor should tell the jury that the same test of scrutinizing the testimony of the defendants would not be applied to the testimony of York and Coble, since they are accomplices." The court immediately added this addition to its charge: "Gentlemen of the jury, the court has given you the rule with reference to the caution and scrutiny that you should con-

sider the evidence of accomplices. It has also given you the rule that you should apply to the consideration of the evidence of the defendants offered by them personally. I don't think that the court—I think I've gone into that fully enough so that you gentlemen will understand what the rule is and I will not at this time repeat it." Reading the charge as a whole there was no inconsistency, and these assignments of error are untenable. We have considered carefully all the other assignments of error under Smith's assignment of error No. 6 and under Paschal, Ferrell, Adams and Money's assignment of error No. 3, and they are not upheld.

Smith assigns as error No. 7 "The trial judge erred in refusing to give the jury the defendant Smith's written prayers for instructions on the question of agency as it related to the conspiracy count;" and assigns as error No. 8 "The trial judge failed to give the jury adequate and correct instructions on the conspiracy count." Paschal, Ferrell, Adams and Money assign as error No. 2 "The trial judge failed to give the jury adequate and correct instructions on the conspiracy count." On these assignments of error the argument in the brief of Smith and in the brief of his four co-defendants is substantially the same with many of the same authorities cited. All the defendants contend that the court's definition of "conspiracy" was fatally defective. The court summarized the first count in the indictment and said: "Conspiracy being an agreement to do an unlawful thing or an agreement to do a lawful thing in an unlawful manner or, more shortly, an unlawful agreement." In *S. v. Davenport,* 227 N.C. 475, p. 493 *et seq.,* 42 S.E. 2d 686, it is said: "A conspiracy is the unlawful concurrence of two or more persons in a wicked scheme— the combination or agreement to do an unlawful thing or to do a lawful thing in an unlawful way or by unlawful means. Citing authorities." The court said further in its charge p. 286 of the Record: "The jury cannot find one defendant alone guilty, because it is necessary that at least two of the defendants combine in order to form a conspiracy." None of the defendants requested a fuller definition of conspiracy. While the court's definition is meager, it is sufficient. The defendants further contend that Count One charges that Smith conspired with his four co-defendants; that there is no evidence that he did so; that, if there was a conspiracy, he conspired through his agents; and there is a fatal variance between *allegata* and *probata.* This is set forth in Smith's prayers 8 and 9. There is plenary evidence that Smith conspired directly with all of his four co-defendants. Smith's assignments of errors Nos. 7 and 8 and the police officer defendants' assignment of error No. 2 are untenable, when the charge is read, and considered as a whole.

Smith assigns as error No. 9 "The trial judge did not comply with the requirements of G.S. 1-180 in that he failed to declare and explain to the jury the law arising on the evidence given in the case with respect to any

of the counts in the indictment." Paschal, Ferrell, Adams and Money assign as their error No. 4 the same as Smith assigns as his error No. 9, and further that the court failed to give equal stress to the contentions of the State and the defendants. The court in its charge stated it had taken longer to give a summary of the State's evidence than the defendants', but they were to attach no significance to that. He gave equal stress to the contentions of the State and the defendants. This was not error. *S. v. Anderson,* 228 N.C. 720, 47 S.E. 2d 1. The court in its charge covered adequately the evidence and contentions of the State and the five defendants. On Count One the court charged as follows: "On count one of the bill of indictment, that is, the one that refers to the alleged conspiracy between Smith and the four policemen, the jury may return a verdict of guilty as to any two or more of the defendants or may return a verdict of not guilty as to one or all of the defendants. The jury cannot find one defendant alone guilty, because it is necessary that at least two of the defendants combine in order to form a conspiracy. So the verdict of the jury may be guilty as to any two or more or not guilty as to one or more or all, as the jury may find and are satisfied from the evidence beyond a reasonable doubt, the burden being upon the State. The defendant Smith cannot be convicted upon the first count unless one or more of the other defendants are likewise convicted."

On counts two to nineteen in the indictment, both inclusive, the court gave as its charge Smith's prayers for instructions on those counts verbatim with a few slight, immaterial variations—being 9 prayers. On counts two and eleven the court charged as follows: "The jury is instructed that the defendant Smith cannot be convicted on count two in the bill of indictment of offering a bribe of one hundred dollars directly or through his agents to R. L. Paschal unless the defendant R. L. Paschal is convicted on count 11 in the bill of indictment of receiving said bribe." An identical charge was given on counts three and twelve, four and thirteen, five and fourteen, six and fifteen, seven and sixteen, eight and seventeen, nine and eighteen, ten and nineteen, as those counts applied to Paschal, Ferrell, Adams and Money. The court then charged: "All of which is to say, gentlemen of the jury, that these counts are interwoven and that in effect that, before you can find Smith guilty of giving a bribe to Paschal, you've got to find that he did it, and find it beyond a reasonable doubt, and you've likewise got to find that Paschal received and find that beyond a reasonable doubt. You gentlemen will understand that in giving you those last instructions which I have just read to you that they are intended as instructions of the court but are not intended to be full. That is, gentlemen of the jury, when I said that Smith couldn't be convicted on a certain charge unless the officer affected in that particular charge was also convicted of receiving a bribe, I mean by that, gentlemen

STATE *v.* SMITH.

of the jury, of receiving a bribe as I have earlier defined that for you, receiving a bribe for the purpose of influencing his official conduct as a member of the city police force, of the City of Greensboro." The court then charged presumption of innocence and added : "The State is required to overcome that presumption and convince you not beyond all or every or any possible doubt but beyond a reasonable doubt that the defendants or some of them are guilty before the defendants or any of them can be convicted." The four police officer defendants say in their brief "this placed the defendant Smith on the coattails of the defendant policemen, and while this may have been a correct statement of law, if his Honor had left it without further elaboration serious prejudicial error against the four defendant policemen occurred when his Honor (1) told the jury that a conviction might follow on the conspiracy count if any two of the defendants should be found guilty, and (2) instructed the jury with reference to all of the charges that the State was required to convince them 'that the defendants or some of them are guilty before the defendants or any of them can be convicted.' " The part above in (1) refers to Count One, and precedes the part of the charge as to Counts Two to Nineteen, both inclusive. The part in (2) follows after the charge on presumption of innocence. Reading the charge as a whole no error appears. If the four police officer defendants were prejudiced by being placed on Smith's coattails, it is not for them to complain, for their connection with Smith in his lottery operations was of their freewill and choice. This assignment of error is not sustained. Certainly Smith cannot complain of the charge on Counts Two to Nineteen, both inclusive. The four policemen defendants further assign as error that "on Counts 12, 16 and 18 the court neglected to mention these counts specifically in the partial recapitulation of the evidence." The court in its charge, while not referring to the numbers of the counts, did recapitulate the evidence on those counts ; on count 12, p. 270 of the Record ; on count 16, p. 274 of the Record ; and on count 18, pp. 279 and 280 of the Record. A careful reading and study of the charge as a whole shows that while it is not as detailed as might be desired, and as we approve, yet it substantially complies with the requirements of G.S. 1-180. It was not prejudicial to the defendants, or any of them. Smith's assignment of error No. 9, and his co-defendants' assignment of error No. 4, are untenable.

The Record consists of 351 pages, the briefs of the State and of the defendants of 128 pages. After a meticulous consideration of all the exceptions brought forward in the appeals of Smith, Paschal, Ferrell, Adams and Money, as well as the entire Record, including the charge of the trial judge, we reach the conclusion that there was no prejudicial error in the trial to justify a new trial for the defendants, or any of them, and that the judgments below must be affirmed.

The evidence in this case of the guilt of all five defendants is over-whelming, and discloses a shocking state of affairs. In one of the most cultured and progressive cities of our State, George Smith operated for ten years or more vast lotteries, taking in for years as banker $4,000.00 a day, five days to the week, after the commissions received by his writers and pick-up men. Paschal, Ferrell, Adams and Money, sworn police officers of the city, conspired with Smith protecting him and annihilating opposition, so as to make Smith the "kingpin," and give him a monopoly. These policemen, derelict in their duty and faithless to their trust, cannot justly complain that they "had two strikes on them" when they were tried with Smith, because when they entered into the unlawful conspiracy with Smith they placed their liberty in his keeping. S. v. Gibson, 233 N.C. 691, 65 S.E. 2d 508.

No error.